[No. S025369. Feb. 7, 1994.]

MARLENE BURCH, Petitioner and Appellant, v.
RANDALL GEORGE, as Trustee, etc., et al., Objectors and Respondents.

**COUNSEL**

Hirschtick, Chenen, Cohen & Linden, Chenen, Cohen & Linden, Marvin M. Lager and C. Kelly McCourt for Petitioner and Appellant.

Mitchell, Silberberg & Knupp, Allan P. Cutrow, Kathleen L. McAchran, Nordman, Cormany, Hair & Compton, Glen M. Reiser and Larry L. Hines for Objectors and Respondents.

**OPINION**

**BAXTER, J.**—Marlene Burch (Marlene) became the fifth wife of Frank Burch (Frank) in December 1985. In 1988, Frank executed his integrated estate plan, which consisted of a will and an inter vivos trust. The beneficiaries of the trust included Marlene, Frank's elderly mother, his children from a prior marriage, and other relatives. Prior to his death in March 1989, Frank transferred substantial assets to the trust.

To discourage litigation over the trust and its distribution scheme, Frank inserted a "no contest clause" in the trust instrument. After Frank's death, Marlene petitioned the probate court to determine whether she may, without violating the no contest clause, proceed with plans to litigate her rights as a surviving spouse to certain assets in the trust estate under California's community property laws and under the federal Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.).

We conclude, based on the language of the trust instrument and the circumstances surrounding its execution, that Marlene's proposed actions would amount to a contest in violation of the instrument's no contest clause. We further conclude that enforcement of the clause against Marlene, in the

event she decides to pursue her claims, is fully consistent with California law and is not preempted by the federal act. As we shall explain, such enforcement will in no way prevent or hinder Marlene from obtaining everything to which she may be entitled under community property and federal laws, but will simply mean that if Marlene chooses to pursue those benefits she may not, at the same time, obtain in addition the portion of Frank's separate property that was conditionally left to her under his trust.

## FACTS

Marlene and Frank married in December 1985. This was Frank's fifth marriage. Prior to the marriage, Frank was part owner of a successful car dealership called Pacific Coast Ford (Pacific Coast). During the marriage, Frank became sole owner of Pacific Coast and a participant in its pension plan.

In July and August of 1988, Frank met with his attorney and instructed him to create an integrated estate plan consisting of a will and an inter vivos trust known as the Frank Burch Family Trust. Pursuant to the trust instrument executed by Frank, the trust estate was to be divided into six separate subsidiary trusts upon Frank's death. Five of these subsidiary trusts were designated for the benefit of Frank's blood relatives, including his elderly mother, his children and a grandchild from a prior marriage. The sixth subsidiary trust was a marital trust in favor of Marlene. Prior to his death, Frank transferred various assets to the trust, including interests in his Pacific Coast stock, his Pacific Coast pension plan account, and six life insurance policies purchased by the pension plan.

To discourage litigation over his estate plan, Frank included a no contest clause in the trust instrument.[1] Under the terms of the clause, any beneficiary who sought to contest or otherwise void, nullify or set aside the trust instrument or any of its provisions would forfeit all right to take under the instrument.

Frank died in March 1989. At the time of his death, the assets that allegedly belonged to Frank were valued at more than $7 million. Outside the trust, Marlene received nearly $800,000 in joint tenancy property and $200,000 in life insurance benefits. Under the trust, Marlene would be provided with substantial assets, consisting of Frank's Mercedes Benz automobile, a 53-foot yacht, a $1 million beach house still under construction, and life insurance proceeds of $60,000. In addition, Marlene would receive a life estate in the income of the marital trust that would pay $6,000 per

---

[1]Frank also inserted a no contest clause into his will.

month. The marital trust was to be funded with $1.6 million of the proceeds derived from the sale of the Pacific Coast stock. Also under the trust, the balance of approximately $4 million, including most of the proceeds from the sale of the Pacific Coast stock and the entire pension plan death benefit of $169,000, would pass to Frank's blood relatives.

After Frank's death, Marlene petitioned the probate court pursuant to Probate Code former section 21305[2] to determine whether she could, without violating the no contest clause, proceed with a proposed state action against the trust to litigate her community property rights in the trust estate and a proposed federal action against the administrators of the Pacific Coast pension plan to litigate her rights under the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.). Relying on the language of the trust instrument, and the uncontroverted declarations of Frank's attorney and one of the trustees of the trust, the probate court ruled, among other things, that both of the proposed actions would trigger the trust instrument's no contest clause because they were "designed to thwart the basic intent of [Frank's] estate plan."

The Court of Appeal affirmed this portion of the judgment.[3] Additionally, the court rejected Marlene's argument that the passive operation of California's no contest law interferes with her rights under the federal act and is therefore preempted. We granted review to consider the important issues presented herein.[4]

### DISCUSSION

This case presents essentially three questions. First, would Marlene's proposed state and federal complaints trigger the no contest clause contained

---

[2]Under former Probate Code section 21305, subdivision (a), a beneficiary could seek an advance ruling from the probate court to determine whether "a particular motion, petition or other act by the beneficiary would be a contest within the terms of a no contest clause." Former section 21305 is continued in section 21320 of the new Probate Code without substantive change. (20 Cal. Law Revision Com. Rep. (1990) p. 1994.)

[3]Based on a concession by a trustee of the trust, the Court of Appeal reversed that aspect of the probate court's judgment that held that the no contest clause would be triggered by a cause of action in Marlene's proposed state court complaint that sought reimbursement from the trust for house construction costs.

[4]While this matter was pending here, the parties informed us that the case had been settled. Nonetheless, they have requested that we decide the issues in this case in the interest of public policy and clarification of the law.

We have inherent power to retain a matter, even though it has been settled and is technically moot, where the issues are important and of continuing interest. (See, e.g., *Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 868-869, fn. 8 [239 Cal.Rptr. 626, 741 P.2d 124], and cases cited therein.) Because the issues at hand meet both criteria, we have concluded it is appropriate for us to retain and decide the matter.

in the trust instrument? Second, if the clause would be triggered, does California law provide a basis for not enforcing the clause against Marlene with respect to the claims based on her community property rights? Third, if the clause is enforceable against Marlene under California law, then does the federal Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) otherwise preclude its operation to the extent pension benefits are at issue? We shall address these questions in order.

### A. Would the No Contest Clause Be Triggered?

■ The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; *Estate of Russell* (1968) 69 Cal.2d 200, 213 [70 Cal.Rptr. 561, 444 P.2d 353]; *Poag* v. *Winston* (1987) 195 Cal.App.3d 1161, 1173 [241 Cal.Rptr. 330].)[5] Since the record in the present case discloses no conflict in the extrinsic evidence, and the parties have identified no issues of credibility, it is our duty to independently construe the trust instrument.

■ An in terrorem or no contest clause in a will or trust instrument creates a condition upon gifts and dispositions provided therein. (See *Estate of Lindstrom* (1987) 191 Cal.App.3d 375, 381 [236 Cal.Rptr. 376].) In essence, a no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument. (See *Estate of Hite* (1909) 155 Cal. 436, 441 [101 P. 443].)

No contest clauses are valid in California and are favored by the public policies of discouraging litigation and giving effect to the purposes expressed by the testator. (*Estate of Hite, supra,* 155 Cal. at pp. 439-441; *Estate of Black* (1984) 160 Cal.App.3d 582, 586-587 [206 Cal.Rptr. 663].) Because a no contest clause results in a forfeiture, however, a court is required to strictly construe it and may not extend it beyond what was plainly the testator's intent. (*Estate of Watson* (1986) 177 Cal.App.3d 569, 572 [223 Cal.Rptr. 14]; *Estate of Black, supra,* 160 Cal.App.3d at p. 587; *Estate of Kazian* (1976) 59 Cal.App.3d 797, 802 [130 Cal.Rptr. 908].)[6]

■ "Whether there has been a 'contest' within the meaning of a particular no-contest clause depends upon the circumstances of the particular case

---

[5]We note that for interpretative purposes, no distinction is made between inter vivos and testamentary trusts. (*Brock* v. *Hall* (1949) 33 Cal.2d 885, 889 [206 P.2d 360, 11 A.L.R.2d 672]; *Wells Fargo Bank* v. *Huse* (1976) 57 Cal.App.3d 927, 932 [129 Cal.Rptr. 522].)

[6]In 1989, the Legislature enacted a series of statutes that codified much of the law governing enforcement of no contest clauses. (Stats. 1989, ch. 544, § 19, p. 1825.) These statutes were repealed and reenacted the following year. (Stats. 1990, ch. 79, § 14, operative July 1, 1991.) Included in these reenacted statutes is a codification of the principle that a no

and the language used." (*Estate of Watson, supra,* 177 Cal.App.3d at p. 572; *Estate of Lindstrom, supra,* 191 Cal.App.3d at p. 381; *Estate of Black, supra,* 160 Cal.App.3d at p. 587.) "[T]he answer cannot be sought in a vacuum, but must be gleaned from a consideration of the purposes that the [testator] sought to attain by the provisions of [his] will." (*Estate of Kazian, supra,* 59 Cal.App.3d at p. 802.) Therefore, even though a no contest clause is strictly construed to avoid forfeiture, it is the testator's intentions that control, and a court "must not rewrite the [testator's] will in such a way as to immunize legal proceedings plainly intended to frustrate [the testator's] unequivocally expressed intent from the reach of the no-contest clause." (*Ibid.*)

With these principles to guide us, we must determine whether the filing of the proposed state complaint or the proposed federal complaint would constitute a contest within the meaning of the no contest clause contained in the Frank Burch Family Trust instrument. These complaints are described in further detail below.

Marlene's proposed state complaint names as defendants the trustees and beneficiaries of the Frank Burch Family Trust and its subsidiary trusts. This complaint alleges in relevant part that 100 percent of the stock in Pacific Coast and 100 percent of the proceeds of various life insurance policies purchased by Pacific Coast's pension plan were purportedly transferred into the Frank Burch Family Trust. It further alleges that under California community property law, Marlene is the owner of one-half of these assets. The complaint seeks the return of her property through various causes of action including declaratory relief, conversion and partition.

Marlene's proposed federal complaint names only the Pacific Coast pension plan and its administrators as defendants. This complaint alleges that, under the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) (hereafter ERISA) and the terms of the pension plan, Marlene is entitled as a surviving spouse to receive 100 percent of the pension plan death benefits, but that the plan administrators have wrongfully refused to pay any benefits to her. In the alternative, the complaint alleges that pursuant to community property law, Marlene is entitled to 50 percent of all of the death benefits and to 50 percent of the benefits payable under the life insurance policies purchased by the pension plan. Finally, the complaint alleges that the administrators breached their fiduciary duties under the federal act by unlawfully converting the disputed benefits and wrongfully failing to provide certain documentation.

contest clause is generally enforceable against a beneficiary who brings a contest within the terms of the clause (Prob. Code, § 21303 [subject to certain exceptions not applicable in this case]), and the principle that in determining the intent of a testator or other transferor, a no contest clause shall be strictly construed (*id.,* § 21304).

In ascertaining Frank's intentions, we look first to the terms of his trust instrument. Those pertinent to our inquiry include: (1) the preliminary recitals, which describe the trust estate; (2) article III, which describes the division of the trust estate upon the trustor's death and directs its distribution; and (3) paragraph 12 of article IX, which contains the no contest clause. These provisions stipulate as follows.

The preliminary recitals provide in relevant part that the trustee "agrees to hold and administer the property listed on the attached 'Schedule A' and any other property added to the Trust Estate according to the terms of the Trust created by this instrument. Trustor states that the property subject to this Trust is his separate property and that his interest therein, and in the proceeds and income therefrom, shall remain his separate property. [¶] All property now or hereafter subject to this Trust shall constitute the Trust Estate and shall be held, managed and distributed as hereinafter provided."

Article III directs that upon the trustor's death, the trustee shall, after making certain specified distributions and payments, divide the residue of the trust estate into six separate trusts. Pursuant to this article, 20 percent of the trust estate goes to the marital trust and the remaining 80 percent is split among four other trusts designated for the benefit of Frank's children, his grandchild, and three children of his deceased sister. Proceeds from certain specified life insurance policies go to a trust designated for the benefit of Frank's mother.

Finally, the no contest clause provides in pertinent part: "In the event that any beneficiary under this Trust . . . seeks to obtain in any proceeding in any court an adjudication that this Trust or any of its provisions . . . is void, or seeks otherwise to void, nullify or set aside this Trust or any of its provisions, then the right of that person to take any interest given to him or her by this Trust shall be determined as it would have been determined had such person predeceased the execution of this trust instrument without issue."

Following the rule of strict construction (*Estate of Watson, supra,* 177 Cal.App.3d at p. 572), we must ascertain from these provisions whether Frank unequivocally intended that Marlene would forfeit the distribution provided for her under the trust instrument in the event that she decides to pursue her interests as a surviving spouse against the trust estate. If this intention plainly appears, then it must be concluded that Marlene's proposed actions would trigger the no contest clause.

It is reasonably clear from the recitals that the trustor intended for any and all property transferred to the trust to be subject to the distribution scheme

set forth at article III of the trust instrument. Significantly, the recitals specifically state that the trustee is to hold and administer "the property listed on the attached 'Schedule A' and any other property added to the Trust Estate according to the terms of the Trust," and that "[a]ll property now or hereafter subject to this Trust shall constitute the Trust Estate and shall be held, managed and distributed as hereinafter provided."

It is also reasonably clear from the trust terms that the trustor intended to dispose of the trust estate in whole, and that he intended to put his surviving spouse to an election between taking the distribution provided for her under the trust, or alternatively, renouncing that distribution and taking against the trust estate pursuant to her independent legal rights. This intention appears from the declaration in the recitals that the property subject to the trust is and is to remain the trustor's "separate property." (See *Estate of Wolfe* (1957) 48 Cal.2d 570, 574-575 [311 P.2d 476]; *Estate of Vogt* (1908) 154 Cal. 508, 512 [98 P. 265]; *Estate of Roach* (1959) 176 Cal.App.2d 547, 552-553 [1 Cal.Rptr. 454].)

■ As Witkin explains, "if the testator refers to the property bequeathed or devised in general terms without identifying it as separate or community, it may be inferred that he intended only to dispose of his own interest (his separate property and one-half the community property), and no election is necessary, no matter how liberal the provision is for the wife. [Citations.]" (12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills and Probate, § 55, pp. 93-94.) On the other hand, "if the testator declares that all the property is his separate property, thus clearly indicating a belief that he is disposing of the entire estate, election is required. [Citations.] 'It is of no concern that he was mistaken in his belief that the wife had no community interest in the property devised. His manifest intention to devise the estate as an entirety, and irrespective of any right which might be asserted on behalf of the marital community, is the controlling factor.' [Citation.]" (12 Witkin, *supra*, § 55, p. 94.)

■ In *Estate of Wolfe, supra*, 48 Cal.2d 570, we described the operative principle this way: "If the testator purported to dispose of both his and his spouse's share of the community property, and it appears that the intent of the testator will be thwarted by giving literal effect to the will while recognizing the community property rights of the surviving spouse, an election should be required. The purpose of the election is to adjust the distribution of the property under the will to conform to the express or implied intention of the testator." (48 Cal.2d at p. 574.) Furthermore, this principle is not limited to community property rights; it is also applicable to any other kind of property right. (*Estate of Waters* (1972) 24 Cal.App.3d 81,

85 [100 Cal.Rptr. 775] [surviving spouse required to elect between taking under the will or asserting her joint tenancy rights to estate property].)

■ Although the trust instrument contains a separate property declaration that evinces an intention to force an election with respect to any asset placed in the trust estate, it is true, as Marlene asserts, that the trust instrument does not expressly name the Pacific Coast stock, the pension plan benefits or the insurance policies as being part of the trust estate.[7] The instrument refers to a list of assets on "Schedule A," but that schedule was evidently never prepared.

In this case, the trustor's intentions are clear, even though the disputed assets were not listed in the trust instrument. First, as the trial court recognized, "[t]here was no requirement under decedent's trust agreement that any or all trust property be reflected in a 'Schedule A,' since the trust corpus by definition included 'any other property added to the Trust Estate.' " Second, Frank apparently arranged to have each of the disputed assets added to the trust estate before his death, thus reflecting deliberate action to place each of them squarely within the terms and conditions of the trust.

The extrinsic evidence in this case confirms our interpretation of the trust's terms.[8] This evidence is uncontroverted that Frank transferred the disputed assets to the trust, that he intended that the trust dispose of these assets, and that any assertion of independent rights to these assets by Marlene would trigger the no contest clause.

A declaration offered by one of the trustees of the trust establishes that Frank transferred to the trust all of the issued and outstanding shares of stock of Pacific Coast, and that he designated the trust as beneficiary of the death benefits paid by the pension plan. The declaration also establishes that Frank

---

[7]We note two exceptions in this regard. The trust instrument specifically provides that the subsidiary trust in favor of Frank's mother is to be funded with proceeds from the trustor's life insurance policies issued by InterAmerican Life Insurance Company and New Jersey Life Insurance Company in the sums of $250,000 and $50,000, respectively. Therefore, the no contest clause would indisputably be triggered to the extent Marlene pursues her alleged community interests in the proceeds of these policies.

[8]Evidence of the circumstances surrounding the execution of the trust instrument is properly admissible to ascertain its meaning and intent. (Prob. Code, § 6111.5; see also *Estate of Russell, supra*, 69 Cal.2d at pp. 206-207, 212; *Estate of Basore* (1971) 19 Cal.App.3d 623, 630 [96 Cal.Rptr. 874].) Contrary to the assertion made by the dissent (dis. opn. of Kennard, J., *post*, at pp. 277-278), resort to extrinsic evidence is appropriate in construing no contest clauses. As one authority relied upon by the dissent acknowledges, "if it is relevant to the clause in question, virtually all evidence of the circumstances surrounding the will's execution may well be admissible to show the existence of an ambiguity and to help construe it." (Garb, *The In Terrorem Clause: Challenging California Wills* (1979) 6 Orange County Bar J. 259, 262.)

purchased nine life insurance policies through the pension plan, and designated all but one of them to be paid either to the trust or to persons other than Marlene.

Another declaration submitted by the attorney who implemented Frank's estate plan provides some context to Frank's execution of that plan. According to the attorney, it was important to Frank that his estate plan provide for his living blood relatives, namely, his three children and a grandchild from a previous marriage, his mother, and the three children of his deceased sister. In connection with the estate planning, Frank discussed with this attorney which assets were to be transferred to the trust, and identified, among other things, the Pacific Coast stock, various insurance policies and his interest in the pension plan.

The attorney further stated that Frank anticipated Marlene would assert claims against the assets that would constitute the trust estate, even though he considered them his separate property. Therefore, Frank intended "to provide generously for Marlene with the hope that this would preclude claims by her upon his estate." In accordance with Frank's plans, the trust instrument provided Marlene a distribution that would include an expensive home, a yacht, a Mercedes Benz automobile and income for life on a 20 percent share of the trust estate remaining after certain specified distributions were made. The instrument also contemplated that the property and interests left to Marlene would be free from death taxes.

Finally, the attorney disclosed that Frank was aware he could not deny Marlene the legal right to assert claims against his trust, or the assets transferred thereto. He added, however, that Frank intended, by the creation of his elaborate estate plan, in combination with the separate property declaration and the no contest clause, to deny Marlene the right to assert ownership claims against the property transferred to the trust, while at the same time, retaining the generous benefits which were conditionally provided for her under that same instrument.

In the proceedings below, Marlene submitted no evidence to controvert the declarations of the trustee or the attorney. Although Marlene makes no present attempt to challenge the admissibility or credibility of their statements,[9] she argues it is unclear whether Frank intended that the trust convey the disputed assets in light of the following three facts. First, Schedule A was never completed and Frank expressed some uncertainty to the attorney regarding what assets were to be included in the trust. Second, Frank's will,

---

[9] In her opening brief on the merits, Marlene merely notes, without citation to authority, that the probate court erred in overruling her objections to the declarations submitted by the trust.

which was executed on the same day as the trust instrument, contained a declaration that he intended to dispose of "all property to which I am entitled by law to dispose of by will." Third, Frank created and controlled Pacific Coast's pension plan and gave her, as an eligible spouse, greater benefits thereunder than required by ERISA. He also never reduced these benefits although he made other changes to the plan, and the plan was not mentioned in either the trust instrument or the will.

In our view, none of these facts renders the trustor's intentions unclear. To begin with, the fact that no Schedule A was ever completed is of no consequence because, as we indicated previously, the trust corpus by definition includes "any other property added to the Trust Estate." While the record shows that Frank may have been uncertain at one time as to the trust's disposition of unspecified assets, it reveals no uncertainty regarding the Pacific Coast stock, the pension plan benefits or the insurance policies.

■ Second, even though Frank's will contained a statement that he intended to dispose of all property to which he was "entitled by law to dispose of by will," this statement creates no ambiguity because its application was limited by its own terms to dispositions *under the will*. It is uncontroverted here that none of the disputed assets passed to the trust under his will.[10]

Third, we are not persuaded that Frank's creation and control of the Pacific Coast pension plan evinces any uncertainty of intention. We note that the pension plan was established and maintained for the benefit of all employees of Pacific Coast and their eligible spouses, not just Frank and Marlene. The fact that Frank had the power to amend the terms of the pension plan but never decreased the benefits to the eligible spouses of Pacific Coast employees bears no logical relation to the inquiry here.

■ Marlene next contends that her proposed federal action would not amount to a contest of the trust instrument because it seeks no relief directly from the trust or Frank's estate. This contention is without merit. The no contest clause expressly applies to the extent Marlene "seeks to obtain in any proceeding in any court an adjudication that this Trust or any of its provisions . . . is void, *or seeks otherwise to void, nullify or set aside this Trust or any of its provisions* . . . ." (Italics added.) Although the proposed federal complaint does not name the trust or Frank's estate as defendants, it does

---

[10]We note that the above mentioned language appearing in the will reflects that the trustor knew how to exclude community property or any property allegedly belonging to Marlene or anyone else from the terms of his will. From this we can infer that the trustor would have included similar language in his trust if he intended to make a similar exclusion with respect to his trust.

seek recovery of the pension plan death benefits and life insurance benefits on the theory that these assets belong to Marlene and that they should not have been transferred to the trust. If successful, the federal complaint, like the state complaint, would effectively nullify or thwart the provisions in the trust instrument that provide for the allocation of all assets placed in the trust estate to the various subsidiary trusts. It would similarly result in the nullification of Frank's clearly stated intent that Marlene be put to an election of her independent rights to all property transferred to the trust. Since it is the intention of the trustor that controls (see *Estate of Kazian, supra,* 59 Cal.App.3d at p. 802), the mere absence of the trust as a defendant in the proposed federal action is not determinative.

Finally, Marlene argues that the no contest clause would not be triggered by her proposed actions because proceedings by beneficiaries to assert claims to property based upon a source of right independent of the will or trust instrument, i.e., creditor's claims, have been held not to be "contests" in a variety of cases. She relies principally on *Estate of Watson, supra,* 177 Cal.App.3d 569, *Estate of Black, supra,* 160 Cal.App.3d 582, *Estate of Schreck* (1975) 47 Cal.App.3d 693 [121 Cal.Rptr. 218], and *Estate of Dow* (1957) 149 Cal.App.2d 47 [308 P.2d 475].

These cases do not stand for the categorical proposition that any proceeding based upon a claim of right independent of a will or trust instrument is never a contest for purposes of the no contest law. The respective courts in these cases simply followed the established rules for construing a no contest clause and determined that the particular claims asserted were consistent with the respective testators' intentions. These cases are factually distinguishable and do not call for a different result in the matter before us.

In *Estate of Black, supra,* 160 Cal.App.3d 582, a woman who had cohabited with the testator for nearly 18 years sought a ruling that the filing of a proposed petition to require conveyance of property in the testator's estate under theories of implied domestic partnership would not violate the no contest clause of the testator's will under which she received a mobilehome and a trust to maintain the mobilehome. In that case, the will described the testator's estate in general terms and contained a statement that the testator intended to dispose of the property which he had the right to dispose of by will. (160 Cal.App.3d at p. 591.) Based on the language of the will, the Court of Appeal held that the proposed petition did not violate the no contest clause because the basis for the petitioner's claim was that the testator did not intend to dispose of by will that property which represented her domestic partnership interest. (*Ibid.*)

The situation before us is completely different. First and foremost, the trust instrument at issue here includes two provisions not present in *Estate of*

*Black, supra*, 160 Cal.App.3d 582: (1) an express declaration that all of the property added to the trust estate was subject to the trust; and (2) an express declaration that all such property was the trustor's separate property and was to remain his separate property. The presence of these two declarations is what distinguishes the instant trust instrument and leads to a different result. Second, there is undisputed extrinsic evidence in this case showing that the trustor did not intend to allow Marlene to retain the distribution conditionally provided for her under the trust in the event she decided to pursue her claims against the trust estate.

*Estate of Schreck, supra*, 47 Cal.App.3d 693, is distinguishable for similar reasons. In that case, the testator left his estate in trust, with income for life to his surviving spouse and remainder to his siblings. The no contest clause applied to anyone who sought " 'to succeed to any part of my estate except through this will.' " (47 Cal.App.3d at p. 695.) A remainderman contended the surviving spouse had violated the clause because she had successfully claimed a Cadillac held in joint tenancy and had some $2,387 in personalty, consisting of the couple's furniture and the testator's wristwatch, set apart to her as exempt from execution. (*Ibid.*) The Court of Appeal rejected this contention and determined there had not been a contest because the testator had not intended to put the surviving spouse to an election of her legal rights. (*Id.*, at pp. 696-697.) Moreover, the spouse had not sought to invalidate the will, nor had the car or the personalty come to her by intestate succession. (*Id.*, at p. 697.) We see no inconsistency between that case and ours. The facts before us simply call for a different result, i.e., the clause at issue here is not limited to "successors" of the trustor, and the separate property declaration and extrinsic evidence reflect a contrary intention on the part of the trustor.

In *Estate of Watson, supra*, 177 Cal.App.3d 569, the court determined that two sisters could file a creditor's claim against their stepmother's estate to enforce an oral testamentary agreement allegedly entered into between the stepmother and their deceased father without violating a no contest clause contained in the father's will. The court found that the attack on the stepmother's will did not constitute a contest of the father's will because the sisters had not attempted to thwart their father's intent but had repeatedly affirmed the provisions of his will. (177 Cal.App.3d at p. 575.) In stark contrast, Marlene's proposed civil actions seek to defeat Frank's intentions as expressed in the trust instrument.

Finally, in *Estate of Dow, supra*, 149 Cal.App.2d 47, the testator had made gifts of property before his death. In his will, he declared that all of his property was his separate property. (149 Cal.App.2d at p. 50.) After the

testator's death, the surviving spouse filed an action in which she claimed that the testator's estate consisted of community property and sought to set aside the gifts. The matter was eventually settled, and some of the gifts were returned to the estate. 'As part of the settlement, the spouse dropped her claim that the estate consisted of community property, and all parties apparently agreed that she could participate in the distribution of the estate. (*Id.*, at pp. 51-52.) The Court of Appeal held that the no contest clause was not triggered, observing that the surviving spouse had effectively "waived" her contention concerning the community character of the estate. (*Id.*, at p. 54.) The court was also impressed with the fact that the action to set aside the gifts had greatly enhanced the value of the decedent's estate. (*Ibid.*) These facts are so far removed from the facts here as to make that case inapposite.

In summary, the terms of Frank's trust instrument and the surrounding circumstances evince an unequivocal intention to preclude Marlene from taking under the trust while at the same time asserting independent ownership claims against the Pacific Coast stock, the pension plan benefits and the life insurance benefits which Frank had transferred to the trust estate. Since Marlene's proposed federal and state actions are each designed to thwart this intention, we conclude that each would constitute a contest within the meaning of the no contest clause and thereby trigger its application.[11]

### B. *Does California Law Provide a Basis for Not Enforcing the Clause in This Case?*

 We now determine whether California law provides a basis for not enforcing the no contest clause against Marlene. In making this determination, we first consider whether a no contest clause is enforceable under current law where the will or trust instrument purports to dispose of assets in which a beneficiary claims ownership or other rights independent of the instrument, such as community property rights.

We have reviewed the Probate Code and the case law and are unable to find any authority for the proposition that a no contest clause is either invalid

---

[11]Marlene also asserts that her proposed state complaint would not trigger the no contest clause because it merely seeks to obtain a construction of the trust instrument and to enforce Frank's intent to the extent it is determined that he did not intend for the stock proceeds and the life insurance benefits to be irrevocably held within the trust and distributed to his blood relatives. (See *Estate of Miller* (1964) 230 Cal.App.2d 888, 903 [41 Cal.Rptr. 410] [action brought to construe a will was not a contest because it sought to ascertain the true meaning of the testatrix and enforce what she desired].) As we have demonstrated above, however, that was not Frank's intention. Furthermore, Marlene's proposed state complaint seeks to recover the disputed assets on the alternative theory that Frank had unlawfully converted them in violation of community property laws. This aspect of the complaint is plainly intended to nullify or void the subsidiary trust provisions that had been drawn up in favor of Frank's mother and other relatives.

or unenforceable against a beneficiary who claims that a will or trust instrument purports to dispose of property in which the beneficiary allegedly has independent interests.[12] This is not surprising; courts have historically enforced no contest clauses against beneficiaries making such claims if that is determined to be what the decedent plainly intended. (E.g., *Estate of Kazian, supra,* 59 Cal.App.3d at pp. 802-803; *Estate of Howard* (1945) 68 Cal.App.2d 9, 11-12 [155 P.2d 841].) Although some courts have chosen not to enforce no contest clauses against beneficiaries asserting independent claims to estate property, they have done so on the basis that the asserted claims were not "contests" within the terms of the particular clauses before them. (E.g., *Estate of Black, supra,* 160 Cal.App.3d 582; *Estate of Schreck, supra,* 47 Cal.App.3d 693.) No court, however, has questioned the general enforceability of no contest clauses as to claims based on the beneficiary's alleged independent rights.

Having concluded that California law does not currently provide for an exception to the enforceability of no contest clauses in these circumstances, we next consider whether such an exception ought to be recognized.

It is Marlene's position that public policy weighs in favor of deeming a no contest clause unenforceable against a surviving spouse who asserts community interests in estate property. She points out there is a strong public policy that favors fair dealing between spouses with respect to marital assets. This policy is now embodied in Family Code section 1100, which prohibits a spouse from conveying or disposing of community personal property without the written consent of the other spouse, and Family Code section 1101, which grants the nonconsenting spouse a right of action against the other spouse for breach of that duty to obtain written consent.

Marlene argues that the enforcement of a no contest clause against a surviving spouse who asserts community interests impairs and effectively prohibits enforcement of those interests. She asserts that a decedent should not be permitted to appropriate 100 percent of the community property, devise an estate plan with a no contest clause, and make a gift of separate property to the surviving spouse to discourage a contest. Marlene reasons that because a decedent may not lawfully dispose of another's property, enforcement of the no contest clause in such a situation encourages intra-marital theft and the forfeiture of community property rights. Much of this

---

[12]The Probate Code expressly provides that no contest clauses are enforceable subject to certain exceptions not relevant here. (See Prob. Code, §§ 21303, 21306 [clause not enforceable against beneficiary acting with probable cause to bring contest based on forgery or revocation], 21307 [clause not enforceable against beneficiary acting with probable cause to contest provision that benefits one who drafted or witnessed the instrument, or that benefits one who gave directions to the drafter without concurrence of the testator or trustor].)

reasoning is echoed by the dissent. (Dis. opn. of Kennard, J., *post*, at pp. 284-285.)

■ We disagree. Both Marlene and the dissent misapprehend the purpose and effect of a no contest clause. Such a clause essentially acts as a disinheritance device, i.e., if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument. ■ Thus, while the enforcement of a no contest clause might work a forfeiture of a surviving spouse's conditional right to take under the trust instrument, it does not, as Marlene and the dissent urge, work any forfeiture or conversion of the spouse's community property.

We have no doubt that no contest clauses discourage some surviving spouses from litigating over perceived community rights in estate property. However, the fact that a no contest clause might discourage a surviving spouse in this way does not mean that a "theft" of community property has occurred. Such a clause does not deprive the spouse of his or her community interests in property, nor does it hinder the ability of the spouse to assert such interests. To the extent the spouse believes valid community claims may be made against estate property, the spouse remains free to pursue them at his or her option. In doing so, however, the spouse may not retain the distribution conditionally provided under the estate plan.

Clearly it is the law that one may not dispose of another's property. Yet it is neither unlawful nor against public policy to enforce a no contest clause against a surviving spouse who decides to pursue community interests in estate property. For over a century, courts have approved the operation of forced elections, even when no contest clauses were not involved. (E.g., *Estate of Murphy* (1976) 15 Cal.3d 907, 913 [126 Cal.Rptr. 820, 544 P.2d 956]; *Estate of Wolfe, supra,* 48 Cal.2d 570, 574; *In re Estate of Smith* (1895) 108 Cal. 115, 119-120 [40 P. 1037]; *Morrison* v. *Bowman* (1865) 29 Cal. 337, 346-352; *Estate of Roach, supra,* 176 Cal.App.2d at p. 551.)

The reasoning underlying the validity and enforceability of a forced election is persuasive in putting into proper perspective the claim that the use of a no contest clause represents an attempt by a trustor or testator to dispose of another's property. "While it is the law that a testator can only dispose of his own property, he may assume to dispose of that which belongs to another, and such disposition may be ratified and confirmed by its owner, by the acceptance, under the will, of a donation, necessarily implying such ratification and confirmation. The act of the testator attempting to dispose of the property of another, and the act of the owner of such property in

accepting the benefit provided for him by the testator, united, complete the disposition, which, without the act of confirmation, would be of no effect." (*Morrison* v. *Bowman, supra,* 29 Cal. at p. 351 [rejecting wife's claim that she was entitled to both accept testator's bequest to her and hold her community rights because testator could not dispose of her community interests by his will].) In other words, "the effectiveness of a testamentary disposition of the surviving spouse's community property interest to third persons depends upon the survivor's voluntary and affirmative acceptance of the will's provisions and cannot stem from the decedent's testamentary act alone. [Citation.]" (*Estate of Murphy, supra,* 15 Cal.3d at p. 915.) This logic applies with equal force to dispel any notion that a no contest clause allows or encourages a testator or trustor to "unlawfully" dispose of another's property.

In assessing the propriety of creating a new exception to the enforceability of no contest clauses, we cannot ignore the fact that the Legislature only recently reaffirmed its approval of no contest clauses as estate planning devices. (Stats. 1990, ch. 79, § 14.) While it may be true that the Legislature has not foreclosed the ability of courts to develop exceptions to the enforceability of such clauses,[13] we do not believe that an exception is appropriate where an assertion of community property rights is made. As the trust in this case illustrates, estate planning for many married couples now entails allocating a lifetime of community and separate assets between the current spouse and children from a previous marriage. The difficulties inherent in ascertaining community interests in otherwise separate property pose a significant challenge to the testator or testatrix. If the testator or testatrix errs in identifying or calculating the community interests in his or her property, costly and divisive litigation may ensue and testamentary distributions in favor of one or more beneficiaries might unexpectedly be extinguished. As both the Legislature and courts have long recognized, no contest clauses serve an important public policy in these situations by reducing the threat of litigation and uncertainty. Therefore, the fact that increasing numbers of spouses and beneficiaries stand to benefit from this time-tested estate planning device is all the more reason for not recognizing the exception Marlene proposes.

---

[13]The Legislature expressly declared that the recently enacted statutes governing no contest clauses are "not intended as a complete codification of the law governing enforcement of a no contest clause. The common law governs enforcement of a no contest clause to the extent this part does not apply." (Prob. Code, § 21301.) The Law Revision Commission comment to this section explains that the common law meant by the drafters refers to "the contemporary and evolving rules of decision developed by the courts in exercise of their power to adapt the law to new situations and to changing conditions." (20 Cal. Law Revision Com. Rep., *supra,* p. 1979.) The comment also indicates that, in developing the common law in this area, the courts are to look to, among other factors, "the terms of the no contest clause and the character of the beneficiary's contest." (*Ibid.*)

Another compelling reason for not creating an exception for community property claims is that such a rule might be counterproductive to the interests of surviving spouses. For instance, the rule might influence some testators and testatrices to make no alternative provisions for their surviving spouses because such a course might be the only way to assure that other intended beneficiaries are adequately provided for in situations where there might be any question of a costly or lengthy community property dispute. Thus, while the proposed exception is advocated for the supposed protection of surviving spouses, it may actually have the undesired effect of depriving some spouses of the opportunity to receive a distribution of assets that is potentially more valuable than or preferable to their community interests in the estate.

Finally, we observe that equitable principles support the enforcement of no contest clauses against surviving spouses asserting community interests in estate property when such claims would plainly frustrate the expectations of the decedent spouses. There is considerable unfairness in allowing a surviving spouse to accept a will or trust instrument to the extent it confers a benefit, and at the same time attack the instrument to the extent it does not. Under such circumstances, the surviving spouse would receive a windfall to the detriment of the other beneficiaries.[14]

Accordingly, we hold that a no contest clause is properly enforceable against a surviving spouse who, under the terms of a will or trust instrument, brings a contest against that instrument based on the assertion of community

---

[14]The following hypothetical situation illustrates the inequitable result that would ensue from Marlene's proposed exception: Husband and Wife get married. For both it is their second marriage. Prior to this marriage, Wife was half owner of a business; during the marriage, she becomes sole owner. When drafting her will, Wife understands that her business may be at least in part community property (or that Husband will argue as much), but she nonetheless desires to leave the entire business to her two children from her first marriage, as they have spent much of their adult lives working there and preparing to take it over. Wife therefore wills the business to her children, but leaves Husband all of her nonbusiness separate property (which is roughly equal in worth to the business). Wife declares in her will that it is her intention to put Husband to an election of his community property rights, and inserts a no contest clause into her will to discourage Husband from bringing a potentially costly, time-consuming and divisive contest based on such rights. Under Marlene's exception, both the forced election and the no contest clause would be deemed unenforceable against Husband in the event he asserts community property interests in the business. The result: Husband receives his community property share of Wife's business, plus retains 100 percent of Wife's other separate property. Wife's unequivocal testamentary intentions are frustrated, and Husband receives a windfall to the detriment of Wife's children.

As this hypothetical situation illustrates, the no contest law operates in a gender-neutral fashion. And, contrary to the dissent's implied assumptions, no contest clauses may frequently be employed where the testator or testatrix acts with utmost good faith toward the other spouse. That is, disputes may often arise after the death of the testator or testatrix even though he or she had kept the other spouse fully informed of all business dealings.

property rights to estate property. When a spouse decides to pursue such a challenge, we see no legal or policy reason that would justify allowing the spouse to also take under the instrument in clear violation of the decedent's intentions.

C. *Is California's No Contest Law Preempted to the Extent Pension Plan Benefits Are at Issue?*

 Marlene's proposed federal complaint alleges that the Pacific Coast employees' pension plan is an employee benefit plan under ERISA (29 U.S.C. § 1001 et seq.). The Pacific Coast pension plan, which is attached to Marlene's proposed federal complaint, specifies that each participant must designate a beneficiary to receive all death benefits, that a participant who has an eligible spouse must designate that spouse as the beneficiary unless the spouse waives in writing the right to be so designated, and that if no beneficiary is designated, all death benefits are payable to the participant's surviving spouse. Marlene's proposed complaint alleges, inter alia, that she did not waive any of her rights under ERISA or the pension plan, and that the administrators of the plan breached their fiduciary duties under ERISA by refusing to pay her any death benefits and refusing to provide any information or documents to which she was entitled. In this section we address Marlene's contention that application of California's no contest law is preempted by ERISA to the extent she seeks recovery of pension plan benefits.

 "ERISA is a comprehensive federal statutory scheme designed to promote the interests of employees and their beneficiaries in employee benefit plans." (*Carpenters So. Cal. Admin. Corp.* v. *El Capitan Development Co.* (1991) 53 Cal.3d 1041, 1047 [282 Cal.Rptr. 277, 811 P.2d 296] [hereafter *Carpenters*].) ERISA was adopted by Congress "to ensure that 'if a worker has been promised a defined benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit— . . . he actually receives it.' [Citation.]" (*Alessi* v. *Raybestos-Manhattan, Inc.* (1981) 451 U.S. 504, 510 [68 L.Ed.2d 402, 408, 101 S.Ct. 1895] [hereafter *Alessi*].)

ERISA contains an express preemption clause providing in pertinent part that the federal act "shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan . . . ." (29 U.S.C. § 1144(a), italics added.) As defined under ERISA, "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." (*Id.,* § 1144(c)(1).) An "employee benefit plan" is defined as including employee pension benefit plans. (*Id.,* § 1002(3).) For purposes

of the preemption clause, a state law "relates to" a benefit plan "if it has a connection with, or reference to such a plan." (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 97 [77 L.Ed.2d 490, 501, 103 S.Ct. 2890] [hereafter *Shaw*]; see also *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 47 [95 L.Ed.2d 39, 47, 107 S.Ct. 1549].)

 The United States Supreme Court has made clear that a state law "relates to" a benefit plan and is preempted if it is specifically designed to affect ERISA benefit plans, or singles out such plans, by express reference, for special treatment. (*Mackey* v. *Lanier Collection Agency & Serv., Inc.* (1988) 486 U.S. 825, 829, 838, fn. 12 [100 L.Ed.2d 836, 843-844, 849, 108 S.Ct. 2182] [finding preemption of Georgia law which singled out ERISA plans for protective treatment under state garnishment procedures]; accord, *Carpenters, supra,* 53 Cal.3d at p. 1049 [finding preemption of statute which created liens on real property in favor of trust funds established pursuant to collective bargaining agreements].) This bright line rule of preemption is not implicated here because California's no contest law makes no specific reference and affords no special treatment to ERISA benefit plans.

 Preemption is less certain when a state law is a neutral law of general application that indirectly affects an ERISA benefit plan. Although it is settled that "even indirect state action bearing on private pensions may encroach upon the area of exclusive federal concern" (*Alessi, supra,* 451 U.S. at p. 525 [68 L.Ed.2d at p. 418] [state statute preempted insofar as it eliminated a method of calculating benefits under ERISA pension plans]), it is also established that a state law may affect a pension plan in "too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan" (*Shaw, supra,* 463 U.S. at p. 100, fn. 21 [77 L.Ed.2d at p. 503]; see *Retirement Fund Trust of Plumbing* v. *Franchise Tax* (9th Cir. 1990) 909 F.2d 1266, 1280-1281 [California's tax levy procedure not preempted]; *Aetna Life Ins. Co.* v. *Borges* (2d Cir. 1989) 869 F.2d 142, 145 [state escheat law not preempted]). Since there is no black letter test for evaluating whether a neutral state law is preempted (see *Duffy* v. *Cavalier* (1989) 215 Cal.App.3d 1517, 1528 [264 Cal.Rptr. 740]), we must analyze what effect the no contest law has upon ERISA plans and whether that effect impermissibly encroaches upon ERISA's exclusive sphere of concern.

Preliminarily we observe that the no contest law fails to fit into any of the four categories of laws that have previously been found to "relate to" ERISA plans: (1) laws that regulate the type of benefits or terms of ERISA plans; (2) laws that create reporting, disclosure, funding or vesting requirements for ERISA plans; (3) laws that provide rules for the calculation of the amount of benefits to be paid under ERISA plans; and (4) laws and common law rules

that provide remedies for misconduct growing out of the administration of ERISA plans. (*Carpenters, supra*, 53 Cal.3d at pp. 1051-1052, citing to *Iron Workers Pension Fund* v. *Terotechnology* (5th Cir. 1990) 891 F.2d 548, 553; see also *Martori Bros. Distributors* v. *James-Massengale* (9th Cir.) 781 F.2d 1349, as amended 791 F.2d 799, cert. den. (1986) 479 U.S. 949 [93 L.Ed.2d 385, 107 S.Ct. 435].) Moreover, application of the law does not call for any interpretation of an ERISA provision, other than that relating to preemption, or for a ruling on the validity of any terms or conditions of an ERISA plan. (See *Duffy* v. *Cavalier, supra*, 215 Cal.App.3d at p. 1529.)

Although the no contest law is unlike any of the laws described above, Marlene contends that the law is preempted because it has a direct regulatory impact on ERISA fiduciaries and the pension plan itself. She points out that her proposed federal complaint contains causes of action against the pension plan administrators that are expressly authorized by ERISA's civil enforcement scheme (see 29 U.S.C. § 1132(a)), and asserts that the effect of the law is to inhibit the assertion of these claims and thereby shield the fiduciaries of the ERISA plan from answering for their wrongful conduct.

We cannot agree. While Marlene's proposed causes of action may be authorized under ERISA, the no contest law does not inhibit her ability to pursue these claims or to take full advantage of ERISA's civil enforcement scheme. Nor does it provide a shield for fiduciaries guilty of wrongful conduct. On the contrary, beneficiaries such as Marlene retain full discretion and opportunity under the no contest law to sue ERISA plan administrators for wrongfully withheld benefits and breaches of fiduciary duty. Hence, the no contest law has no regulatory impact, direct or otherwise, on ERISA fiduciaries or ERISA plans.[15]

Marlene next argues that the no contest law is preempted because it has an impermissible "chilling effect" on the pursuit of her rights under ERISA that renders those rights essentially worthless. To support her position, Marlene cites a federal decision dealing with attorney fees issues under an ERISA provision (29 U.S.C. § 1132(g)) that authorizes such fees to prevailing parties in ERISA actions. (*Jones* v. *O'Higgins* (N.D.N.Y. 1990) 736 F.Supp. 1243.)[16] In that case, the district court exercised its discretion in refusing to award attorney fees against a plaintiff who had demonstrated a prima facie

---

[15]In *Aetna Life Ins. Co.* v. *Borges, supra*, 869 F.2d 142, 146-148, the Second Circuit held that ERISA does not preempt a state law of general application that has an incidental economic and administrative impact upon an ERISA benefit plan. We note Marlene makes no contention that application of the no contest law would have any sort of economic or administrative effect upon ERISA plans.

[16]Under 29 United States Code section 1132(g)(1), the decision whether to award attorney fees and costs is generally based on five factors: (1) the degree of the offending party's

case of an ERISA violation. In doing so, the court observed: "In circumstances where the plaintiff has come forward with a prima facie case of an ERISA violation, a decision to award attorney's fees would likely operate to 'chill' other plaintiffs from asserting their rights under ERISA." (736 F.Supp. at p. 1246.)

We are not convinced. First, Marlene cites no authority standing for the proposition that ERISA preempts any state law that has a "chilling effect" on the assertion of ERISA rights. Second, assuming for the sake of argument that a state law is preempted to the extent it "chills" the exercise of ERISA rights, her attempt to analogize the application of the no contest law to the imposition of a sanction such as an award of attorney fees is without merit. As explained previously (at p. 254, *ante*), a no contest clause in a will or trust instrument operates to condition a beneficiary's right to take a gift provided under the instrument upon the beneficiary's agreement to acquiesce to its terms. (See *Estate of Hite, supra*, 155 Cal. 436, 441; *Estate of Lindstrom, supra*, 191 Cal.App.3d 375, 381.) Since application of the no contest law merely enforces the conditional nature of a private testamentary gift to which the beneficiary is not otherwise entitled, such a law bears no meaningful resemblance in function to an award of sanctions.

Indeed, in the event Marlene decides to pursue her claims to the ERISA benefits in federal court and she prevails, application of the no contest law would not prevent or hinder her from obtaining everything to which she is entitled under ERISA.[17] There certainly is nothing about the law that would render those benefits worthless. At the same time, if Marlene decides to pursue her ERISA claims and she loses, the no contest law would not authorize attorney fees or any other analogous type of sanction against her for having exercised her rights. We therefore conclude that the no contest law has no "chilling effect" on the exercise of ERISA rights.

Notwithstanding the above, Marlene argues that the no contest law presents a situation parallel to *MacLean* v. *Ford Motor Co.* (7th Cir. 1987) 831 F.2d 723, in which application of a state's testamentary law was found to be preempted. In that case, the executor of the decedent's estate sought to have the decedent's ERISA plan benefits distributed pursuant to the terms of his will, rather than in accordance with the beneficiary designation provision

culpability or bad faith; (2) the ability of the offending party to satisfy an award of attorney fees; (3) whether an award of fees would deter other persons from acting similarly under like circumstances; (4) the relative merits of the parties' positions; and (5) whether the action conferred a common benefit on a group of pension plan participants. (*Jones* v. *O'Higgins, supra*, 736 F.Supp. at p. 1244.)

[17]In fact, Marlene may even be entitled to attorney fees and costs under 29 United States Code section 1132(g).

contained in his pension plan. In concluding that ERISA preempted application of the testamentary law, the Seventh Circuit reasoned that the law, if applied, would determine the distribution of plan assets even though the plan already provided a method for determining such distribution. (831 F.2d at pp. 727-728; cf. *Ablamis* v. *Roper* (9th Cir. 1991) 937 F.2d 1450 [nonemployee spouse may not bequeath one-half of surviving employee's pension benefits to third party under California's community property law]; *Iron Workers Mid-South Pension Fund* v. *Stoll* (E.D.La. 1991) 771 F.Supp. 781, 785-786 [state domestic property statutes may not operate to change beneficiary of pension plan death benefit].)

This argument is off the mark. While *MacLean* v. *Ford Motor Co.*, *supra*, 831 F.2d 723, and the other cases cited above indicate that Marlene might prevail in her proposed federal action to recover the disputed pension plan benefits, they do not suggest that ERISA preempts that aspect of the no contest law that would operate to preclude Marlene from taking a private trust distribution consisting of nonpension assets at the same time. As one court aptly stated, "[i]n deference to state prerogatives within the federal system, we must not find such a traditional exercise of state power preempted unless the conclusion is 'unavoidable.' [Citation.]" (*Aetna Life Ins. Co.* v. *Borges*, *supra*, 869 F.2d at p. 147.) In the instant situation, a finding of preemption is properly avoided because application of the no contest law against Marlene would only affect her right to receive a distribution of nonpension assets under the Frank Burch Family Trust.

Finally, Marlene argues that enforcement of the no contest law "interferes" with her rights in violation of an ERISA statute which provides: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act. The provisions of section 1132 of this title shall be applicable in the enforcement of this section." (29 U.S.C. § 1140.)

We are not persuaded. Our previous analysis explains why the no contest law does not impede or interfere with Marlene's attainment of her ERISA

benefits. Moreover, although enforcement of the no contest clause will result in Marlene's forfeiture of nonpension-related gifts and assets, she cites no authority suggesting that state enforcement of the conditional nature of a private gift constitutes an "interference" within the meaning of 29 United States Code section 1140. Rather, it appears that the prohibitions contained therein "were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." (*West* v. *Butler* (6th Cir. 1980) 621 F.2d 240, 245.) Although some courts have applied this statute outside the context of an employment relationship (see *Vogel* v. *Independence Federal Sav. Bank* (D.Md. 1988) 692 F.Supp. 587, 593 [applying statute to group health insurer]; *McGinnis* v. *Joyce* (N.D.Ill. 1981) 507 F.Supp. 654, 656-657 [applying statute to plan trustees who threatened violence against participant]), Marlene identifies no decision that has recognized its application to a state statute or under circumstances otherwise analogous to those here.

Based on the foregoing, we are satisfied that California's no contest law is a neutral state law of general application that here would only tenuously affect an ERISA plan, if at all, and would therefore not impermissibly encroach upon ERISA's exclusive sphere of concern. (See *Retirement Fund Trust of Plumbing* v. *Franchise Tax*, *supra*, 909 F.2d at pp. 1280-1281.) Accordingly, we hold there is no preemption with respect to enforcement of the no contest clause at issue.

## CONCLUSION

The terms of the trust instrument and the surrounding circumstances evince an unequivocal intent by Frank to foreclose Marlene from retaining the distribution provided for her under that instrument in the event she proceeds to assert her independent ownership claims to the assets in dispute. That being the case, we conclude that the no contest clause would be triggered by Marlene's proposed state and federal actions.

We further conclude that there is no legal or public policy basis for not enforcing the clause against Marlene. In doing so, however, we wish to emphasize that we are not expressing any opinion on the merits of Marlene's claims to the disputed assets as a surviving spouse under community property law and ERISA.[18] Nor are we placing any "stamp of approval" upon the trustor's alleged breach of trust, or suggesting any "endorsement" of marital duplicity, as the dissent accuses us of doing. We hold only that the clause

---

[18]Although the dissent has apparently already prejudged the merits of these claims, it is up to the state trial court and the federal district court to decide these matters in the event Marlene decides to pursue them.

would be enforceable against Marlene in the event she proceeds with her proposed state and federal complaints. We also wish to reiterate that enforcement of the clause will in no way inhibit or interfere with Marlene's ability to obtain everything to which she may be entitled under community property and federal laws. It will simply mean that if Marlene decides to pursue her complaints she may not, at the same time, also obtain the portion of Frank's separate property conditionally left to her under his trust.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Panelli, J., Arabian, J., and George, J., concurred.

**MOSK, J.**—I dissent for the irrefutable reasons expressed in parts I and II of Justice Kennard's dissent. Because the views expressed in those portions of Justice Kennard's dissent adequately resolve the question before us, I do not join and express no opinion with regard to part III.

**KENNARD, J.,** Dissenting.—In this case a husband, without his wife's knowledge or consent, took his wife's property and gave it to his relatives as part of his estate plan. One might expect, in view of the relationship of trust and confidence between marriage partners, that this maneuver would not survive judicial scrutiny. But a majority of this court places its stamp of approval upon this breach of trust, and comes dangerously close to endorsing marital duplicity in financial matters. I dissent.

Frank Burch caused his lawyers to draw up a will and trust that, unbeknownst to his wife Marlene, distributed Marlene's interests in community property and her federally guaranteed death benefit pension rights to Frank's relatives. Frank sought to ensure the success of his plan by inserting a "no contest" or "in terrorem" clause in the trust instrument, intending that if Marlene challenged any provision of his will or trust, she would have to forfeit any benefits she received under the trust. Marlene sought to challenge the use of the no contest clause to work such a forfeiture.

Even though the Legislature has mandated that such no contest provisions be strictly construed, and the wife's proposed challenge does not come strictly within the express terms of the forfeiture clause, the majority concludes that if the wife challenges the husband's attempted disposition of her assets, the forfeiture clause will be triggered. The community property laws and the public policy of this state forbid one spouse to unilaterally dispose of the assets of the community. Nevertheless, the majority holds that a husband who seeks, without the knowledge or consent of his wife, to dispose of community assets and her separate assets may be shielded by the operation

of a no contest clause in a trust or will. And, even though the wife's pension rights are guaranteed under the federal Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.), which Congress intended to preempt conflicting state law, the majority holds that the husband's unilateral diversion of his wife's federally guaranteed pension rights does not offend federal law.

I do not agree. As I will explain, I would hold: (1) that, applying the statutory mandate to "strictly construe" no contest clauses, filing either the proposed state court or federal court complaints in this case would not amount to a "contest"; (2) that a no contest clause does not apply against the assertion of a spouse's community interest in donative property; and (3) that the application of a no contest clause in a testamentary instrument under California law to divest a party of federally guaranteed pension rights is preempted under ERISA.

## I. BACKGROUND

Frank and Marlene Burch married in December 1985. Before the marriage, Frank had an unspecified ownership interest in Pacific Coast Ford, a corporation operating an automobile dealership; after he and Marlene were married, Frank apparently became the sole shareholder. During the marriage, Frank became a participant in the Pacific Coast Ford pension plan. In mid-1988, Frank retained an attorney to prepare a will and a testamentary trust known as the Frank Burch Family Trust (hereafter the trust).

The primary beneficiaries of the trust were Frank's blood relatives. During the marriage, Frank transferred certain assets into the trust, including all the stock of Pacific Coast Ford and the entire interest in the pension plan created after Frank and Marlene were married. The trust included a subsidiary marital trust containing substantial assets to pass to Marlene, but the marital trust did not contain any interest in Pacific Coast Ford or in the pension plan.

The trust instrument had a no contest clause which provided, in pertinent part: "In the event that any beneficiary under this Trust . . . contests in any court the validity of this Trust or of Trustor's last will, or seeks to obtain in any proceeding in any court an adjudication that this Trust or any of its provisions or that such Will or any of its provisions is void, or seeks otherwise to void, nullify or set aside this Trust or any of its provisions, then the right of that person to take any interest given to him or her by this Trust shall be determined as it would have been determined had such person predeceased the execution of this trust instrument without issue." The will contained a similar clause. The trust instrument additionally recited that "the

property subject to this Trust is [the trustor's] separate property and that his interest therein . . . shall remain his separate property."

Frank died in March 1989. Both Frank and Marlene had apparently brought substantial assets to the marriage. At the time of his death, the assets claimed to be Frank's were valued at more than $7 million. Property worth approximately $800,000 passed directly to Marlene by joint tenancy. Outside the trust, Marlene also received life insurance proceeds of $200,000. Under the trust, Marlene received life insurance proceeds of $60,000, and a life estate in the income from a subsidiary marital trust of about $1.6 million. The balance of approximately $4.3 million, including most of the proceeds from the sale of the Pacific Coast Ford stock and the entire pension plan death benefit of $169,000, passed under the trust to Frank's blood relatives.

In December 1990, Marlene filed two petitions under former Probate Code section 21305 seeking a determination whether certain ERISA and community property claims could be brought in federal and state court without invoking the no contest clause. She attached proposed complaints to each of her petitions.

The proposed federal court complaint named only the pension plan trustees as defendants. It alleged, among other things, that: (1) under 29 United States Code section 1055 and the terms of the pension plan, Marlene was entitled as a surviving spouse to receive 100 percent of the death benefits payable under the plan, but the plan trustees had refused to pay any benefits to her; (2) under California community property law, Marlene was entitled to 50 percent of all Frank's income, and was therefore entitled to half of all benefits under the plan, which benefits had been unlawfully converted by the trustees; (3) the trustees had breached their fiduciary duties; and (4) the trustees had wrongfully failed to provide information, in violation of 29 United States Code section 1132(c).

The proposed state court complaint named as defendants the trustees of the trust, its beneficiaries, and its subsidiary trusts. It alleged, among other things, that Marlene never consented to the transfer of any of her interest in community property into the trust. The property transferred without her consent included 100 percent of the shares of stock in Pacific Coast Ford, the pension plan interest, and several life insurance policies purchased with community funds. The complaint set forth causes of action for, among other things, conversion, declaratory relief, and partition.

The Probate Code petitions were opposed by the trust and several of its beneficiaries. The trial court consolidated the petitions, and ruled that both

proposed complaints would trigger the no contest clause. The trial court also ruled that ERISA did not preempt application of the no contest clause.

Marlene appealed, and the Court of Appeal affirmed the judgment of the trial court.[1]

## II. No Contest Clauses

### A. Strict Construction

The law regarding no contest clauses, also called "in terrorem" clauses, is not uniform in the United States. In a few states such clauses are unlawful, and are given no effect, apparently based on the view that "to inhibit a party from ascertaining his rights by appeal to the [courts]" is "against the fundamental principles of justice." (Leavitt, *Scope and Effectiveness of No-Contest Clauses in Last Wills and Testaments* (1963) 15 Hastings L.J. 45, 55; see, e.g., Fla. Stat. § 732.517 (1992); Ind. Code § 29-1-6-2 (1992); cf. *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133 [270 Cal.Rptr. 1, 791 P.2d 587].) In most jurisdictions, however, the courts uphold no contest clauses, subject to an important restriction: no contest clauses apply only to beneficiaries who contest a will when they have no probable cause to do so. (See, e.g., U. Prob. Code § 3-905 (1983); Rest.2d Property, Donative Transfers (1983) § 9.1.)

California follows a minority rule: no contest clauses are effective, and there is no broad "probable cause" restriction as in most jurisdictions. Nevertheless, no contest clauses are not accorded expansive effect in California. They are not favored. "Public policy [is] as much concerned in upholding the right of a citizen to have his [or her] claim determined by law as it is to prevent contests of wills." (*Lobb* v. *Brown* (1929) 208 Cal. 476, 490-491 [281 P. 1010].) Shortly after this court's recognition that no contest clauses were not invalid as against public policy in *Estate of Hite* (1909) 155 Cal. 436 [101 P. 443], we emphasized that such clauses are "by way of forfeiture" and therefore are to be "strictly construed." (*Estate of Bergland* (1919) 180 Cal. 629, 633 [182 P. 277, 5 A.L.R. 1363].) And in 1989, the Legislature codified the rule of strict construction for no contest clauses, thereby placing its stamp of approval on the narrow and cautious approach to such provisions taken by the judiciary. (Prob. Code, § 21304.)

Probate Code section 21304 provides: "In determining the intent of the transferor, *a no contest clause shall be strictly construed.*" (Italics added.)

---

[1] With respect to one cause of action in the state court complaint, the Court of Appeal reversed the trial court, and determined that Marlene could seek declaratory relief regarding her right to reimbursement for certain residential construction costs under the trust. This issue was conceded by the trustees.

The meaning of strict construction in the context of wills is succinctly summarized in a recent law review article: "Whereas 'strict construction' of wills emphasizes the written word and confines interpretation to the 'plain meaning' of the words found within 'the four corners of the instrument,' a more 'liberal construction' emphasizes the testator's intent as the primary determinant and thus allows extrinsic evidence of that intent." (Collins & Skover, *Paratexts* (1992) 44 Stan.L.Rev. 509, 541-542, fn. 171, citing Atkinson, Handbook of the Law of Wills (1953) pp. 808-809.)

Our law is in accord. This court has held that strict construction means that "[n]o wider scope is to be given to [the testator's] language than is plainly required." (*Estate of Bergland, supra,* 180 Cal. at p. 635.) Only when an act "come[s] strictly within the express terms" of the no contest clause will a breach be declared. (*Lobb* v. *Brown, supra,* 208 Cal. at p. 492.)

B. *Strict Construction Applied*

As noted earlier, the no contest clause in the trust instrument in this case provided: "In the event that any beneficiary under this Trust . . . contests in any court the validity of this Trust or of Trustor's last will, or seeks to obtain in any proceeding in any court an adjudication that this Trust or any of its provisions or that such Will or any of its provisions is void, or seeks otherwise to void, nullify or set aside this Trust or any of its provisions, then the right of that person to take any interest given to him or her by this Trust shall be determined as it would have been determined had such person predeceased the execution of this trust instrument without issue."

It is undisputed that Marlene's proposed federal and state court complaints do not seek to set aside the trust in its entirety. The question, therefore, is whether either proposed complaint "seeks . . . an adjudication that . . . any . . . provision [ ] [of the trust instrument] is void, or seeks otherwise to void, nullify or set aside" any provision of the trust instrument.

In accordance with Probate Code section 21304, this clause must be strictly construed. I turn first to the proposed state court complaint. It names as defendants the trust and the subsidiary trusts, and all of their beneficiaries and trustees. The proposed state court complaint sets forth causes of action for declaratory relief to construe the trust instrument, conversion, breach of fiduciary duty and partition, and seeks to impose a constructive trust and to set aside fraudulent conveyances.

The proposed state court complaint does not seek an adjudication that any provision of the trust instrument is void or should be set aside. It is therefore

not, on its face, an attack on a provision in the trust instrument, and accordingly it cannot be a contest.

The proposed federal court complaint names only the pension plan trustees as defendants. It sets forth causes of action for breach of statutory obligations under ERISA, for conversion, for declaratory relief, and for breach of fiduciary duties. Like the proposed state court complaint, the proposed federal court complaint does not seek an adjudication that any provision of the trust instrument is void or should be set aside. It is also, on its face, not an attack on a provision in the trust instrument, and accordingly it cannot be a contest.

Nevertheless, the trustees contend that the proposed state and federal court complaints necessarily and in substance seek an adjudication that a provision of the trust instrument is void and should be set aside. The trustees focus on this provision of the instrument: "Trustor states that the property subject to this Trust is his separate property and that his interest therein, and in the proceeds and income therefrom, shall remain his separate property." The trustees contend that Marlene's proposed state court complaint challenges this clause because Marlene claims that the property subject to the trust is not Frank's separate property, but community property instead. Similarly, the trustees contend that the proposed federal court complaint challenges this clause because Marlene claims that the ERISA death benefits that were made subject to the trust are under federal law payable to Marlene only.

The difficulty with the trustees' argument is that Frank did not expressly identify in the trust instrument what property he considered to be his separate property. In this case, the trust instrument does not even purport to dispose of any interest in the property that Marlene claims is community property, or of any interest in property that Marlene claims is her separate property. Thus, Marlene does not seek to set aside the provision in the trust instrument quoted above, but merely to have a court construe that provision so as not to include property that is rightfully hers.

As the proposed state court complaint confirms, Marlene has strong claims that the Pacific Coast Ford stock and the life insurance proceeds were community property and not Frank's separate property. Under Family Code section 760, all property acquired by a married person during the marriage is presumed to be community property. The record in this case shows that Frank and Marlene were married in December 1985; although Frank's initial ownership interest in the dealership preceded the marriage, Frank became president and sole shareholder of Pacific Coast Ford in June 1986. Similarly, the record confirms that the life insurance policies at issue were purchased during the marriage.

Moreover, Marlene also has a strong claim that the ERISA death benefits were also not Frank's separate property that he was entitled to dispose of as he wished. ERISA generally mandates that each pension plan must provide "a qualified preretirement survivor annuity" to the surviving spouses of plan participants. (29 U.S.C. § 1055(a)(2).) The plan, a copy of which is attached to Marlene's proposed federal court complaint, appears to comply with the requirement for qualified preretirement survivor annuities. No party other than the surviving spouse has any claim under federal law to this death benefit.

The majority places great reliance on the language in the trust instrument that the trustee is to hold "the property listed on the attached 'Schedule A' and any other property added to the Trust Estate according to the terms of the Trust." The majority seems to conclude that this language shows that Frank expressly intended the Pacific Coast Ford stock, the life insurance proceeds, and the pension plan assets to be added to the trust corpus. No schedule A was ever prepared, however. And the majority ignores the instrument's requirement that property added to the trust estate must be added "according to the terms of the Trust." But the terms of the trust specify that only Frank's separate property is subject to disposition. There is nothing in the terms of the trust that indicates that Frank sought to dispose of Marlene's property. Thus, reading the language of the trust strictly, community property and Marlene's separate property could not have been added to the trust estate "according to the terms of the Trust."

Because Frank did not expressly identify in the trust instrument what property he considered to be his separate property, we must give the phrase "separate property" its usual legal meaning. (See *Estate of Carter* (1956) 47 Cal.2d 200, 205 [302 P.2d 301].) Whatever ambiguity may be said to inhere in the phrase "separate property," it plainly cannot be construed to mean "community property" or "separate property of another." Nevertheless, that is exactly what the majority does in this case. The majority first purports to find ambiguity in this unambiguous phrase, and then turns to evidence extrinsic to the trust instrument itself—specifically, the declarations of two lawyers. One of the lawyers is also a trustee of the trust and is named as a defendant in Marlene's proposed state court complaint, and the other is the attorney who drafted the trust instrument and could face potential liability in this matter. As I shall discuss, however, the majority's approach to construction of no contest clauses is contrary to the statutory mandate.

Probate Code section 21304, as noted above, requires that no contest clauses be "strictly construed." In determining the legislative intent of a statute, it is proper to look to comments by a law revision commission,

which are persuasive evidence of the intent of the Legislature in enacting commission recommendations. (E.g., *People* v. *Garfield* (1985) 40 Cal.3d 192, 199 [219 Cal.Rptr. 196, 707 P.2d 258].) This is particularly true when, as happened with section 21304, the Legislature adopts without any change the statute proposed by a commission. (40 Cal.3d at p. 199; accord, *Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 250 [66 Cal.Rptr. 20, 437 P.2d 508].)

The Law Revision Commission comment on Probate Code section 21304 states: "In the interest of predictability, it resolved a conflict in the case law in favor of strict construction. Cf. Garb, The In Terrorem Clause: Challenging California Wills, 6 Orange County [Bar] J. 259 (1979). Strict construction is consistent with the public policy to avoid a forfeiture. Cf. Selvin, Comment: Terror in Probate, 16 Stan. L. Rev. 355 (1964). . . ." (20 Cal. Law Revision Com. com., Deering's Ann. Prob. Code, § 21304 (1991 ed.) p. 578.) The report of the Law Revision Commission relies on the same sources and is to the same effect. (Recommendation Relating to No Contest Clauses (Jan. 1989) 20 Cal. Law Revision Com. Rep. (1990) p. 12.)

As the preceding comment indicates, the conflict in the case law perceived by the drafters of Probate Code section 21304 was based on the analysis of a bar journal article, Garb, *The In Terrorem Clause: Challenging California Wills* (1979) 6 Orange County Bar J. 259 (Garb). This article observed that "[a]lthough numerous cases state that a no-contest clause should be strictly construed and should be limited in scope so as to include no conduct other than that which the language plainly requires, some recent cases have construed such clauses so broadly as to bring into question the validity of the rule of strict construction." (*Id.* at p. 262.) The author distinguished those cases in which the concept of a contest was "given its definitive legal meaning" or limited to "technical attack[s] on the competency of the testator, fraud or undue influence," from those cases in which the court considered "whether or not the action thwarted the decedent's intent" or "whether there was a purpose to defeat the provisions of the will" on the part of a beneficiary. (*Id.* at pp. 263-264.)

As an example of a case that "signal[ed] a departure from the earlier cases requiring a strict interpretation of the clause," (Garb, *supra*, at p. 263) the author cited *Estate of Kazian* (1976) 59 Cal.App.3d 797 [130 Cal.Rptr. 908]. In *Estate of Kazian*, the court recited the rule of strict construction, but then proceeded to state that whether there was a contest "must be gleaned from a consideration of the purpose[s] that the [testator] sought to attain by the provisions of [his or her] will." (59 Cal.App.3d at p. 802.)

The "purposes" approach of the *Kazian* court is virtually identical to the analytic approach used by the majority in this case. (See maj. opn., *ante*, at

p. 255.) It is, however, an approach that was flatly rejected by the Legislature when it adopted Probate Code section 21304. By enacting this statute, the Legislature resolved the conflict in the case law by rejecting the *Kazian* "purposes" approach and by embracing the rule of strict construction.

Here, the majority, following the approach of cases rejected by the Legislature when it endorsed the rule of strict construction by adopting Probate Code section 21304, determines that the purposes of the testator would be best served by a construction of the language of the trust instrument that is dependent upon references to extrinsic indicia of the testator's intent. This construction flies in the face of the rule that "[a]n intention on the part of the testator to dispose of his wife's interest in the community property will not be implied where another construction is permissible." (*Estate of Wolfe* (1957) 48 Cal.2d 570, 576 [311 P.2d 476].)

The majority recognizes that it must identify a provision of the trust instrument that, in its view, Marlene seeks to "void, nullify, or set aside." Thus, the majority asserts that Marlene seeks to "void, nullify or set aside" the provision of the trust instrument that provides for the allocation of trust assets to the subsidiary trusts. (Maj. opn., *ante*, at p. 261.) The problem with this assertion is obvious. As noted earlier, the instrument requires that the property added to the trust estate must be added "according to the terms of the Trust," and the terms of the trust specify only that Frank's separate property, not Marlene's property, is subject to disposition. Therefore, Marlene's claim that her property was improperly added to the trust corpus cannot rationally be considered an attempt to void any provision of the trust instrument relating to the subsidiary trusts; instead, it is an attempt to enforce the provision that specifies that property added to the trust estate must be added "according to the terms of the Trust." The majority's approach is not strict construction; it is arbitrary and expansive construction. It is at odds with the Legislature's plainly expressed intent that no contest clauses be strictly construed.

Under a strict and narrow construction of the no contest clause in this case, the clause would be triggered only if a beneficiary sought to have the trust or some particular provision of the trust declared void, or otherwise nullified or set aside. Because the proposed state and federal court complaints in this case seek neither to have the trust instrument nor any of its provisions declared void, or otherwise nullified or set aside, the filing of either complaint would not trigger the no contest clause. This is the only interpretation that is consistent with the Legislature's express command that no contest clauses be "strictly construed." To do otherwise, as the majority in this case has done by disregarding the literal meaning of the words in the

trust instrument in favor of attempting to divine the testator's intent through declarations of his lawyers, is to abandon the rule of strict construction and to resurrect the very conflict in the case law that the Law Revision Commission and the Legislature sought to put to rest with Probate Code section 21304.

### C. *Claims to a Community Property Interest*

Probate Code section 21303 provides: "Except to the extent otherwise provided in this part, a no contest clause is enforceable against a beneficiary who brings a contest within the terms of the no contest clause." Despite this broad language, the Legislature did not intend that the statutes governing no contest clauses do so exclusively. Probate Code section 21301 states: "This part is not intended as a complete codification of the law governing enforcement of a no contest clause. The common law governs enforcement of a no contest clause to the extent this part does not apply." As the Law Revision Commission comment to this section makes clear, by "the common law" the commission meant "the contemporary and evolving rules of decision developed by the courts in exercise of their power to adapt the law to new situations and to changing conditions." (Cal. Law Revision Com. com., Deering's Ann. Prob. Code, § 21301, *supra*, p. 576.) The comment also indicates that, in developing the common law in this area, the courts are to look to, among other things, "the terms of the no contest clause and the character of the beneficiary's contest." (*Id.* at p. 577.) Here, Marlene's argument that her proposed state court complaint should not be held to violate the no contest clause is based on the "character of [her] contest."

Specifically, Marlene contends that, even if the no contest clause would be triggered by the filing of the proposed state court complaint, this court should determine that the clause is not enforceable against her because, under common law principles, a no contest clause does not apply against the assertion of a property interest not arising from the claimant's status as an heir—for example, a community property interest.

This court has not previously addressed the question. Several Courts of Appeal have considered situations in which a claimant sought to establish an independent property interest in the donated property, with inconsistent results.[2] I would hold that no contest clauses are not enforceable against a beneficiary who claims that the trustor or testator has disposed of a legal

---

[2]Compare, e.g., *Estate of Kazian, supra,* 59 Cal.App.3d 797 (holding that assertion of community property interest did trigger no contest clause) with *Estate of Black* (1984) 160 Cal.App.3d 582 [206 Cal.Rptr. 663] (holding that assertion of "palimony" interest did not violate no contest clause) and *Estate of Schreck* (1975) 47 Cal.App.3d 693, 697 [121 Cal.Rptr.

interest, such as a community property interest, in identified personal or real property that is lawfully held by the beneficiary.

My conclusion is based upon several considerations. First, enforcement of a no contest clause to prevent a beneficiary from challenging the trustor's disposition of property that is not the trustor's property, but is the property of another, would not aid the public policy favoring enforcement of such clauses. As this court stated in an early case, "[a] testator has the lawful right to dispose of *his property* upon whatever condition he desires, as long as the condition is not prohibited by some law or opposed to public policy . . . ." (*Estate of Miller* (1909) 156 Cal. 119, 121 [103 P. 842], italics added.) A later case made the point more expansively: "*The property of a testatrix is hers to dispose of as she wills*, and she is not called on to consult or follow the wishes or views of her heirs or beneficiaries or of courts or juries. . . . She could give or refrain from giving, and could attach to her gifts any lawful condition which her reason or caprice might dictate. *She was disposing of her own property* and the beneficiary claiming thereunder must take the gift, if at all, on the terms offered." (*Estate of Fuller* (1956) 143 Cal.App.2d 820, 823 [300 P.2d 342], italics added.)

The underlying assumption of these cases is that a no contest clause is valid insofar as it assures that a testator or trustor may, without challenge, dispose of property that belongs to him or her. But the converse of that proposition should also be true: under California law, a no contest clause should not be valid insofar as it allows a testator or trustor to dispose of property that does not belong to him or her.

This point needs little elaboration. Nothing in the policy favoring no contest clauses was designed to encourage theft. Yet if a testator or trustor lays claim to property that does not belong to him or her, and successfully insulates the disposition of such property from challenge by use of a no contest clause, theft is the result.

Several familiar maxims of jurisprudence support my conclusion that a no contest clause cannot be invoked to penalize one who seeks to establish that the property the testator or trustor purported to dispose of was not the testator's or trustor's property. "When the reason of a rule ceases, so should the rule itself." (Civ. Code, § 3510.) The reason for the rule allowing no contest clauses is to allow the testator to dispose of his or her property, not the property of another. Moreover, "[n]o one can take advantage of his [or her] own wrong." (Civ. Code, § 3517.) For the courts to enforce no contest

218] (holding that assertion of separate property and joint tenancy interests did not violate no contest clause, because "[t]he widow merely claimed what was already her own").

clauses that are used to deprive individuals of their own property would allow the estates and trusts of testators and trustors who have acted wrongly to take advantage of the wrongs of those testators and trustors.

A second, related rationale also supports my conclusion. As this court recognized in *Estate of Miller, supra,* 156 Cal. at page 121, judicial enforcement of no contest clauses is also limited to situations in which the no contest condition is "not prohibited by some law or opposed to public policy . . . ." But in this case, and in similar situations, law and public policy do stand in opposition to the trustor's employment of the no contest clause.

Allowing enforcement of a no contest clause to effectively prohibit assertion of statutorily guaranteed community property rights is contrary to the public policy embodied in Family Code sections 1100 and 1101. Those sections provide that a spouse may not convey or dispose of community personal property without the written consent of the other spouse, and grant the nonconsenting spouse a right of action against the other spouse for breach of that duty to obtain written consent.

As mentioned earlier, Marlene's proposed state court complaint alleged that she had a community interest in the ownership of Pacific Coast Ford, and in the car dealership's pension plan. Although Frank apparently had an ownership interest in Pacific Coast Ford before his marriage to Marlene, he became the sole owner and president of the company during the marriage. The pension plan was created during the marriage. Generally, "all [personal] property . . . wherever situated, acquired by a married person during the marriage . . . is community property." (Fam. Code, § 760.) Accordingly, there is merit in Marlene's argument that the property Frank transferred without her consent during the marriage was community property.

To allow a spouse to transfer community property during the marriage without the other spouse's consent and then allow enforcement of a no contest clause to effectively prevent assertion of community property rights is violative of Family Code sections 1100, 1101 and the public policy embodied in these statutes.

The majority reaches a contrary conclusion. That conclusion, however, is based on a misunderstanding of the nature of no contest clauses, and a mistaken and apparently unexamined assumption that there is no legal difference between an "election" under a testamentary instrument and a forfeiture worked by a no contest clause. Moreover, the majority's conclusion is buttressed by a hypothetical example that illuminates its mistaken view of the respective rights and obligations of the parties.

The majority approves the use of no contest clauses to obstruct the assertion of community property rights because no contest clauses are, in the majority's view, indistinguishable from election clauses in testamentary instruments, which California courts have long approved. (See, e.g., *Estate of Wolfe, supra*, 48 Cal.2d 570, 574.) But the majority's reasoning is flawed, and again disregards legislative judgments as to the true nature of no contest clauses. It may be permissible for a trustor to require his or her surviving spouse to elect between an interest as a beneficiary and the spouse's interest in community property. But, as the Legislature indicated in the legislative history accompanying Probate Code section 21304, a no contest clause entails a *forfeiture*, not an election. Under a testamentary instrument containing a no contest clause, "the gift vests immediately upon the testator's death as a vested right and is just as much the beneficiary's property as if acquired by his [or her] own labor; to wrench it away is precisely what is meant by a forfeiture." (Selvin, *Comment: Terror in Probate* (1964) 16 Stan.L.Rev. 355, 368, fns. omitted.) A no contest clause, when it applies, destroys the surviving spouse's rights under the testamentary instrument simply because the spouse attempts to enforce his or her independent property rights, *whether or not the spouse actually succeeds.* This harsh result, which is precisely what is contemplated by every trustor or testator who chooses to employ a no contest clause, is simply not possible when a similar, though more benign, election clause is employed instead. An election clause destroys nothing.[3]

The majority also utilizes a hypothetical example to show the supposed unfairness of any rule that no contest clauses are not enforceable against a spouse who seeks to assert only his or her own interest in community property. (Maj. opn., *ante*, at p. 267, fn. 14.) Under the majority's example, a wife who has children by a previous marriage is half-owner of a business in which she works with her children; during her second marriage "she becomes sole owner." (*Ibid.*) "Wife understands that her business may be at least in part community property, . . . but she nonetheless desires to leave the entire business to her two children from her first marriage . . . ." Accordingly, under the majority's example, the wife inserts a no contest clause into her will, but under a rule rendering such forfeiture clauses unenforceable against a spouse who asserts his or her own interest in community property, the no contest clause is ineffective. This, the majority says, is an "inequitable result." (*Ibid.*)

---

[3]The majority evidences a fundamental misunderstanding of the forfeiture at issue here, and misreads my dissenting opinion. (See maj. opn., *ante*, at p. 265.) Marlene's community property rights are subject to conversion as a result of the operation of the no contest clause in this case, but, contrary to the majority's assumption, the forfeiture is of her right to take under the trust instrument, not of her rights in community property.

The majority's hypothetical discloses nothing so much as the majority's dissatisfaction with the community property laws of this state. Under Family Code section 760, "all [personal] property . . . acquired by a married person during the marriage . . . is community property." Thus, under the majority's hypothetical, the husband *is* a co-owner of the business with the wife, whether the wife, or the majority, care for that fact or not. (See *Schnabel* v. *Superior Court* (1993) 5 Cal.4th 704, 715 [21 Cal.Rptr.2d 200, 854 P.2d 1117].) There is nothing inequitable about a rule that precludes one spouse from unilaterally disposing of property belonging in part to the other spouse. To the contrary, equitable considerations *mandate* that the interests of the nonconsenting spouse be protected.

And this simple and fair rule is in no way unworkable; it merely requires that the wife in the majority's hypothetical disclose her plans in advance to her co-owner and partner-in-marriage, and obtain his consent. The majority seems to find a requirement of disclosure and consent unacceptable; the majority comes dangerously close to endorsing marital duplicity in financial matters.[4]

Because enforcement of a no contest clause to penalize the assertion of community property rights does not serve the underlying purpose of no contest clauses—to permit the testator or trustor to dispose of his or her own property as desired—and because enforcement of a no contest clause that shields an improper disposition of property belonging to the testator's or trustor's spouse would place the court's seal of approval on a violation of the fiduciary obligations imposed on spouses by the community property laws, I would hold that no contest clauses are not enforceable under these circumstances.

## III. No Contest Clauses and ERISA Preemption

According to the allegations of Marlene's proposed federal court complaint, Pacific Coast Ford Employees' pension plan is an employee benefit

---

[4]The majority also claims that a rule precluding one spouse from disposing of the other spouse's interest in community property would be "counterproductive to the interests of surviving spouses" because it might "depriv[e] some spouses of the opportunity to receive a distribution of assets that is potentially more valuable than . . . their community interests in the estate." (Maj. opn., *ante*, at p. 267.)

This is misleading. Nothing in the proposed rule set forth in my dissent would preclude a testator from leaving any separate property to his or her spouse. Nor would anything in this dissent preclude use of an election clause to require a spouse to choose between taking under a trust or taking under the community property laws. The only "counterproductive" effect of this dissent would be to discourage one spouse from unilaterally and secretly disposing of assets of the other partner to a marriage.

Our law should encourage spouses to deal fairly and openly with each other, and discourage secretive dealings of the sort the majority approves in this case.

plan as defined by 29 United States Code section 1002. Under 29 United States Code section 1055(a), "[e]ach pension plan . . . shall provide that— [¶] . . . [¶] (2) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant." The plan, a copy of which is attached to the proposed complaint, appears to comply with the requirement for qualified preretirement survivor annuities. It specifies that each participant must designate a beneficiary to receive all death benefits, that a participant who has an eligible spouse must designate that spouse as the beneficiary unless the spouse waives the right to be so designated, and that if no beneficiary is designated, all death benefits are payable to the participant's surviving spouse. As noted above, Marlene's proposed federal court complaint asserts that she did not waive any of her rights under ERISA or the plan,[5] and that the plan's trustees have failed and refused to pay her any benefits, to provide an accounting, or to provide any explanation of why the benefits have not been paid.

## A. *Express Preemption*

The majority concludes that ERISA does not preempt operation of the no contest clause in this case. I disagree. California's no contest law is preempted by ERISA to the extent it interferes with the exercise of federally guaranteed pension rights.

"ERISA is a comprehensive federal statutory scheme designed to promote the interests of employees and their beneficiaries in employee benefit plans." (*Carpenters So. Cal. Admin. Corp.* v. *El Capitan Development Co.* (1991) 53 Cal.3d 1041, 1047 [282 Cal.Rptr. 277, 811 P.2d 296].) ERISA contains an express preemption clause specifying that the federal regulatory scheme "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." (29 U.S.C. § 1144(a).) "The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." (29 U.S.C. § 1144(c)(1).)

This preemption provision is broad in its sweep. The United States Supreme Court has characterized it as "deliberately expansive" (*Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 46 [95 L.Ed.2d 39, 46-47, 107 S.Ct. 1549]), "broadly worded" (*Ingersoll-Rand Co.* v. *McClendon* (1990) 498

---

[5]Title 29 United States Code section 1056(d) states that "(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."

There is an exception for "qualified domestic relations orders," which are court judgments or orders that relate to child support, alimony payments or marital property rights. (29 U.S.C. § 1056(d)(3).) No party contends, however, that the alleged alienation of Marlene's rights to death benefits under the plan was made as part of a qualified domestic relations order.

U.S. 133, 138 [112 L.Ed.2d 474, 483, 111 S.Ct. 478]), and " 'conspicuous for its breadth' " (*Morales* v. *Trans World Airlines, Inc.* (1992) 504 U.S. __, __ [119 L.Ed.2d 157, 167, 112 S.Ct. 2031, 2037]). The statutory words "relate to" were used by Congress "in their broad sense, rejecting more limited pre-emption language that would have made the clause 'applicable only to state laws relating to the specific subjects covered by ERISA.' " (*Ingersoll-Rand Co.* v. *McClendon, supra*, 498 U.S. at p. 138 [112 L.Ed.2d at p. 483].) Thus, a state law "relates to" a benefit plan " ' "if it has a connection with, or reference to such a plan." ' " (*Pilot Life, supra*, 481 U.S. at p. 47 [95 L.Ed.2d at p. 48].) " 'Because of the breadth of the preemption clause and the broad remedial purpose of ERISA, "state laws found to be beyond the scope of [the preemption clause] are few." ' " (*Carpenters So. Cal. Admin. Corp.* v. *El Capitan Development Co., supra*, 53 Cal.3d at pp. 1048-1049.)

The breadth of ERISA preemption is not limitless. "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 100, fn. 21 [77 L.Ed.2d 490, 503, 103 S.Ct. 2890].) As with all questions of preemption, however, " ' " '[t]he purpose of Congress is the ultimate touchstone.' " ' " (*Carpenters So. Cal. Admin. Corp.* v. *El Capitan Development Co., supra*, 53 Cal.3d at p. 1047, quoting *Ingersoll-Rand Co.* v. *McClendon, supra*, 498 U.S. at p. 138 [112 L.Ed.2d at p. 483].)

The trustees point out that neither the no contest statutes nor the no contest clause in the trust instrument makes any explicit reference to ERISA, and stress that if Marlene elects to forego taking under the trust, she is free to pursue her ERISA claims.

I find unpersuasive the assertion that, because the no contest law makes no express reference to ERISA, there can be no preemption. The high court has held that ERISA preemption is not limited to "state laws specifically designed to affect employee benefit plans" (*Shaw* v. *Delta Air Lines, supra*, 463 U.S. at p. 98 [77 L.Ed.2d at p. 501]), and that "even indirect state action bearing on private pensions may encroach upon the area of exclusive federal concern" (*Alessi* v. *Raybestos-Manhattan, Inc.* (1981) 451 U.S. 504, 525 [68 L.Ed.2d 402, 418, 101 S.Ct. 1895]). It is the substance of a law's effect on ERISA, not its label or form, that controls. (*Ibid.*)

The majority concludes that the no contest law as applied in this case is too tenuous, remote and peripheral to ERISA plans for express ERISA preemption to apply.

I cannot agree. Here, the application of the no contest law would interfere with the operation of the plan under federal law. The main practical effect of

the no contest clause, if valid under California law, would be to condition the exercise of Marlene's federally protected right to receive ERISA benefits, or even to seek a judicial determination of her entitlement to benefits, on a forfeiture of benefits under the trust instrument.

The leading federal appellate case that has addressed the question of ERISA preemption of state testamentary law has come to a conclusion similar to mine in this case. In *MacLean* v. *Ford Motor Co.* (7th Cir. 1987) 831 F.2d 723, 728, the court held that "when . . . the terms of an employee pension plan under ERISA provide a valid method for determining the beneficiary, that mechanism cannot be displaced by the provisions of a will." Here, the ERISA plan provided a method for determining the beneficiary. But, through use of the no contest law, Frank sought to displace Marlene as the beneficiary.

Other federal courts faced with analogous situations have reached results in accord with that of the *MacLean* court. In *Ablamis* v. *Roper* (9th Cir. 1991) 937 F.2d 1450, 1459-1460, the Ninth Circuit held that "[p]ermitting a non-employee spouse to bequeath one-half of a surviving employee's pension benefits to a third party [under California community property law] would do 'major damage' [citation] to ERISA's objective of ensuring and strengthening pension benefits for retirees and their dependents" and was, therefore, preempted. Similarly, in *Iron Workers Mid-South Pension Fund* v. *Stoll* (E.D.La. 1991) 771 F.Supp. 781, 785-786, the court held that Oklahoma domestic property statutes could not operate to change the beneficiary of a pension plan death benefit. (Accord, *Meek* v. *Tullis* (W.D.La. 1992) 791 F.Supp. 154, 155-156; see also *Gilbert* v. *Burlington Industries, Inc.* (2d Cir. 1985) 765 F.2d 320, 327; *Aetna Life Ins. Co.* v. *Borges* (2d Cir. 1989) 869 F.2d 142, 147 & fn. 4.)

As noted above, under the terms of the plan, and in accordance with the substantive terms of ERISA, Marlene is the beneficiary of death benefits. By contrast, under the trust instrument as construed by the majority, all property subject to the trust, including all rights in the plan, is swept into the trust res and distributed according to the trust formulas. Under the trust instrument as the majority have construed it, Marlene is divested of her rights as the plan beneficiary under the terms of the plan and ERISA.

To be sure, this divestment is not absolute. As the trust emphasizes in its brief, even under the no contest law Marlene remains free to pursue her rights under ERISA—at the cost of forfeiting all rights to take under the trust. But the express preemption clause of ERISA does not supersede only those state laws that necessarily have the unconditional effect of depriving a statutorily designated beneficiary of her rights.

Indeed, the high court has several times made clear that ERISA's preemption provision " 'displace[s] *all* state laws that fall within its sphere, even including state laws that are *consistent* with ERISA's substantive requirements.' " (*Mackey* v. *Lanier Collection Agency & Service* (1988) 486 U.S. 825, 829 [100 L.Ed.2d 836, 844, 108 S.Ct. 2182] (italics added), quoting *Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 739 [85 L.Ed.2d 728, 739, 105 S.Ct. 2380].) Rather, ERISA's preemption clause supersedes all state laws that "relate to" operation of a plan, unless the effect is "tenuous, remote, or peripheral." I cannot say that the effect of the no contest law on the ERISA plan in this case is "tenuous, remote, or peripheral." On the contrary, the effect here is direct and substantial: Marlene is compelled to forgo her federally protected right to benefits under ERISA unless she forfeits her right to take under the trust. I conclude that the operation of the no contest law in this case "relates to" the operation of a plan under ERISA, and therefore is preempted under ERISA's express preemption clause.

### B. *Implied Preemption*

Even when there is no express preemption under ERISA, the United States Supreme Court has held that a state law or action may also be superseded by ERISA under the doctrine of implied preemption. (*Ingersoll-Rand Co.* v. *McClendon, supra,* 498 U.S. 133.) Generally, the doctrine of implied preemption applies when a challenged state action " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*English* v. *General Electric Co.* (1990) 496 U.S. 72, 79 [110 L.Ed.2d 65, 74, 110 S.Ct. 2270], quoting *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed.2d 581, 587, 61 S.Ct. 399].)

Here, the issue is whether application of the state no contest law to discourage assertion of rights under ERISA stands as such an obstacle. The majority concludes it does not. The majority is wrong. In *Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. 41, the United States Supreme Court declared that in ERISA, "Congress set out to 'protect . . . participants in employee benefit plans and their beneficiaries, by . . . establishing standards of conduct . . . for fiduciaries of employee benefit plans and by providing for appropriate remedies, sanctions, and ready access to the Federal Courts.' " (*Id.* at p. 44 [95 L.Ed.2d at pp. 45-46], quoting 29 U.S.C. § 1001(b).)

Two other statutes are relevant. Title 29 United States Code section 1140 provides, in pertinent part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, [or] this title . . . or for the purpose of

interfering with the attainment of any right to which such participant may become entitled under the plan [or this title]. . . ."

And 29 United States Code section 1132(a) provides: "A civil action may be brought—[¶] . . . (1) by a participant or beneficiary—[¶] . . . [¶] (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; [¶] . . . [¶] (3) by a participant, beneficiary, or fiduciary . . . (B) . . . (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ."

Thus, through these statutes Congress has expressly granted beneficiaries the right to bring legal actions to enforce their rights to plan benefits. Here, Marlene's proposed federal complaint falls "squarely within the ambit" of actions contemplated by these statutes. (*Ingersoll-Rand Co.* v. *McClendon, supra*, 498 U.S. at p. 142 [112 L.Ed.2d at p. 486].)

The legislative history also unmistakably conveys the intent of Congress with regard to lawsuits by plan beneficiaries. The House Report states that "[t]he primary purpose of [ERISA] is the protection of individual pension rights . . . ." (H.Rep. No. 93-533, 1st Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News, p. 4639.) The Senate Report states that the intent of Congress was "to remove . . . procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities . . . or recovery of benefits due to participants." (Sen.Rep. No. 93-127, 1st Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News, p. 4871.)

Therefore, in this case, not only is Marlene's proposed federal court complaint of a type specifically authorized by Congress, but the assertion of the state no contest law as a barrier to her recovery of ERISA rights itself is unlawful under 29 United States Code section 1140. That is, the evident purpose of the no contest clause in the trust instrument *is* to "interfer[e] with the attainment of [a] right" to which Marlene became entitled under ERISA.

In any event, the United States Supreme Court has made clear that when it " ' "may fairly be assumed that the activities which a State purports to regulate are protected" ' " by ERISA, " ' "due regard for the federal enactment requires that state jurisdiction must yield." ' " (*Ingersoll-Rand Co.* v. *McClendon, supra*, 498 U.S. at p. 145 [112 L.Ed.2d at p. 488].) Here, it may fairly be assumed that Marlene's proposed federal complaint is within the contemplation of the drafters of ERISA. Accordingly, any state regulation that stands as an obstacle to assertion of her rights under ERISA, including

the operation of a no contest clause, must yield and is preempted. The majority's contrary conclusion is erroneous. State testamentary law cannot stand as an obstacle to the achievement of the congressional goal, even if the federally protected party is not completely divested of her right to pursue the federal remedy, but only substantially discouraged.

## CONCLUSION

In enacting the California Law Revision Commission's proposed changes to the Probate Code sections governing no contest clauses, including the rule that such clauses be "strictly construed" (Prob. Code, § 21304), the Legislature sought to implement "the public policy to avoid a forfeiture" and to rectify the situation created by previous law, under which "a beneficiary cannot predict with any consistency when an activity will be held to fall within the proscription of a particular no contest clause." (Recommendation Relating to No Contest Clauses, *supra*, 20 Cal. Law Revision Com. Rep. at p. 12.) In this case, the majority turns the statutory revision on its head, expansively construing a no contest clause to reach a conclusion resulting in a forfeiture that is plainly unsupported by the language of the trust instrument. In so doing, the majority undermines the legislative scheme, and unavoidably resurrects the very controversy and confusion the Law Revision Commission and the Legislature sought to lay to rest.

It is a fundamental principle of community property law that property acquired during the marriage is presumed to be community property, and it is equally fundamental that one spouse cannot dispose of the property of the community without the other spouse's consent. In this case, the majority demonstrates its evident dissatisfaction with these fundamental principles by holding that one spouse can indeed dispose of the property of the community without the other spouse's knowledge or consent, and our courts will allow the spouse to shield his wrongful action through enforcing a no contest clause against the other spouse's assertion of her community property rights. Ironically, the majority claims that "fairness" supports its result.[6]

In enacting ERISA, the primary purpose of the United States Congress was to protect individual pension rights, and the Congress explicitly prohibited any "interfer[ence] with the attainment of any right" to which a beneficiary might be entitled under an authorized pension plan. (29 U.S.C. § 1140.) In this case, contrary to the unambiguously expressed will of

---

[6]The majority vehemently denies that it has endorsed any breach of marital trust in this case. (Maj. opn., *ante*, at pp. 273-274.) But the majority cannot deny that, under its rule, a husband can, without the knowledge or consent of his wife, take his wife's property and give it to his relatives as part of his estate plan. If this underhanded maneuver is not a breach of trust, nothing is.

Congress, the majority holds that a no contest clause can indeed stand as a successful obstacle to a widow's assertion of her federally protected pension benefits.

I cannot agree. I would reverse the judgment of the Court of Appeal.