Filed 3/18/15  Kramer v. Puracyp CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KYLE KRAMER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PURACYP, INC., et al.,<br><br>    Defendants and Respondents. | D065400<br><br><br>(Super. Ct. No.<br> 37-2011-00058121-CU-BC-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline

M. Stern, Judge.  Affirmed in part; reversed in part and remanded with directions.

Gaston & Gaston and Matthew J. Faust for Plaintiff and Appellant.

Kaloogian & Fuselier, Lowell Robert Fuselier and David J. Hart for Defendants

and Respondents.

Plaintiff Kyle Kramer appeals a judgment following a nonjury trial of his breach

of contract action against defendants Puracyp, Inc. (Company), Mark Dale and Judy

Raucy (together Defendants).  On appeal, Kramer contends the trial court erred by: (1)

misconstruing the contract and finding he was not entitled to shares of Company stock

because he did not pay for them; (2) finding he did not prove his claim for earned, but unpaid, salary; (3) finding the four-year statute of limitations barred part of his claim for unpaid salary; and (4) not compelling Dale and Raucy to attend the trial.

FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Kramer began providing Company with consulting services to help it find business partners in Japan. In July 2005, Dale, Company's chief executive officer, made an offer to Kramer to become an employee and a 20 percent shareholder of Company. Kramer accepted the offer and became the Company's vice president of business development as of August 1, 2005. In December, Company and Kramer entered into a written agreement, titled the "Terms Agreement" (Agreement), setting forth their understanding of their oral agreement. The Agreement provided in pertinent part:

> "2. <u>Services Provided by Kyle Kramer</u>. [¶] During the Term of the Agreement [i.e., August 1, 2005, through August 1, 2009], Kyle Kramer hereby agrees to endeavor to attain suitable business for [Company's] products and Services with persons, firms or companies located or doing business in all territories of the world. The primary role of Kyle will be one of business development, but not restricted to such activities. . . . In exchange of such services [Company] offers the following:
>
> "2.1 <u>Compensation</u>. Kyle Kramer will receive a salary paid monthly or bi weekly amounting to $150,000 per year. *This salary will be paid starting when* [Company] *is financially able to compensate at this level*. This is a base salary and it is anticipated bonuses and other like incentives will be part of the total compensation. [¶] . . . [¶]
>
> "2.2 <u>Equity Position</u>. *Kyle Kramer will receive an undilutable equity position* in [Company] *of 20% over the term of the Agreement*. The current share holdings of the company will be adjusted accordingly to reflect an ownership position of 20%. The agreed upon terms of this *vesting schedule is 5% annually* with an

2

anniversary date of August 1. The schedule is Exhibit A. Should the management of [Company] decide to sell the company or transfer ownership, Kyle Kramer's 20% equity position will automatically vest at the time of sale and or ownership transfer." (Italics added.)

In 2006, Company and Kramer signed an addendum (Addendum), dated August 1, 2005, which clarified certain terms of the Agreement. The Addendum provided in pertinent part:

"The *Agreement calls for a 20% ownership position* in [Company] *for Kyle Kramer* over a four year period of time. Per the [A]greement[,] the *first year salary will be $150,000.* [Company] and Kyle Kramer have agreed *for the time period of August 1, 2005 to August 1, 2006*, that *Kyle will contribute $8500 per month back* to [Company] *for the 20% ownership position* over the four-year time period.

"For the remaining two [sic] years of the Agreement, salary, excluding benefits and equity are agreed to as follows: [¶] August 1, 2006 to August 1, 2007, $175,000 [¶] August 1, 2007 to August 1, 2008, $200,000 [¶] August 1, 2008 to August 1, 2009, $225,000[.]" (Italics added.)

Under the Addendum, Kramer therefore would contribute back a total of $102,000 for his 20 percent equity position in Company (i.e., shares of Company stock representing a 20 percent ownership interest).

During his first year of employment (i.e., Aug. 1, 2005, through Jul. 31, 2006), Kramer received about $30,000 in salary. During the first and each subsequent year of the Agreement's term, Kramer was told that Company did not have the money (i.e., was not financially able) to pay his full salary. Therefore, Kramer never received the full amount of his salary as set forth in the Agreement and Addendum. On or about April 27, 2011, Company sent Kramer a letter terminating his employment. That letter stated in

3

part: "1. [Company] will continue to pay you at the present salary until the company is able to settle a buy-out payment, which will be based upon [Company's] current value minus debts and royalties. . . . [¶] 2. These paychecks will be part of the buy-out and will be subtracted from your settlement payment."

Kramer filed the instant complaint against Defendants, alleging causes of action for breach of written contract, breach of oral contract, and declaratory relief. Kramer alleged Company breached the Agreement by: (1) not paying him his agreed salary; and (2) not issuing shares of Company stock representing a 20 percent equity ownership interest. He requested relief consisting of compensatory damages, declarations that he is a vested 20 percent owner of Company stock and that Company must issue stock certificates to him representing that ownership, and an order compelling Company to issue stock certificates to him representing that ownership. During a two-day nonjury (i.e., bench) trial, Kramer presented his own testimony, as well as the testimony of Jerome Lasker, a former Company employee, and certain documentary evidence. Defendants called Kramer back to the stand and questioned him on direct and then rested without presenting any further testimony. The parties stipulated that Kramer received from Company a total of $497,265 in salary, commissions, and purchase of a car during his employment.

The trial court issued a final statement of decision finding in favor of Defendants. The court stated in relevant part:

> "[The Agreement] contained the ambiguity that the [C]ompany would not have to start to pay [Kramer's] full salary until it was 'financially able' to do so. . . . However, [Kramer] did not present

4

any expert testimony regarding the [C]ompany's finances and was unable to procure the [Company] CEO's [i.e., Dale's] attendance at trial. This [A]greement also called for [Kramer] to receive an equity position in the [Company] of 20 percent over the four (4) year term of the [A]greement, at a rate of 5 percent per year. . . . [¶] . . . [¶]

"[Kramer's] claim for 20 percent of [Company's] capital stock is also uncertain. Defense counsel contended [Kramer] waived his right to the shares in his deposition testimony where he stated he was not asking for the shares of stock, but rather its 'financial value.' This was in contrast to his declaratory action claim which asked the Court to declare him an owner of 20 percent of the shares.

"Defendants' claim that even if [Kramer] is able to 'revive' his claim for the stock, the evidence was he never paid the specified $102,000 for it. While [Kramer] testified he understood he forewent salary to pay for the stock, there was no evidence of it. He did testify he was paid 'around $30,000' the first year of employment, but those two figures do not equate to the first year's salary of $150,000. In addition, [Kramer's] lack of memory as to whether he paid taxes on this 'credit' makes his claim less than credible."

On November 4, 2013, the trial court entered judgment for Defendants. The court denied Kramer's motion for a new trial. Kramer timely filed a notice of appeal.

## DISCUSSION

### I

### *Standards of Review and Principles of Contract Interpretation*

When an appellant challenges a trial court's interpretation of a written contract, the substantial evidence standard of review applies when the contract is ambiguous and conflicting extrinsic evidence is admitted to assist the court in interpreting the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 (*Parsons*).) However, if interpretation of the contract does *not* turn on the credibility of conflicting extrinsic evidence, the trial court's interpretation of the contract is a question of law we

review de novo, or independently. (*Ibid*.; *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604 (*Johnson*); *Burch v. George* (1994) 7 Cal.4th 246, 254 (*Burch*); cf. *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 196 ["An appellate court is not bound by the trial court's construction of a contract when, as here, the interpretation is based solely upon the terms of the written instrument without any assessment of conflicting extrinsic evidence."].) Furthermore, "to the extent the evidence is not in conflict, we construe the [contract], and we resolve any conflicting inferences, ourselves." (*Schaefer's Ambulance Service v. County of San Bernardino* (1998) 68 Cal.App.4th 581, 586 (*Schaefer's Ambulance Service*).)

"A contract must be interpreted so as to give effect to the mutual intent of the parties. [Citation.] The terms of a contract are determined by objective rather than subjective criteria. The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) Accordingly, "[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.)

"When considering a question of contractual interpretation, we apply the following rules. 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citation.] 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' [Citation.] 'When a

contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .' " (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709.) "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.)

"When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean? [Citation.] [¶] Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation]." (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847-848.) If a contract is susceptible to two different reasonable interpretations, the contract is ambiguous. (*Ibid*.) A court must then construe that ambiguous contract language "by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties [citation]." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798.)

7

On appeal, a "trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus[,] the threshold determination of ambiguity is subject to independent review." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) If the contract language is determined to be ambiguous and conflicting extrinsic evidence was admitted on the meaning of that language, "any reasonable construction will be upheld as long as it is supported by substantial evidence." (*Id*. at p. 1166.) If, however, no extrinsic evidence was admitted or the extrinsic evidence is not conflicting, the construction of the ambiguous contract language is a question of law subject to our independent construction. (*Ibid.*) Because the evidence in this case is undisputed, we construe the Agreement and Addendum de novo, or independently, and do not defer to the trial court's interpretation. (*Maggio v. Windward Capital Management Co.* (2000) 80 Cal.App.4th 1210, 1214; *Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189.)

II

*Kramer's Claim for Shares of Company's Stock*

Kramer contends the trial court erred by misconstruing the Agreement and Addendum and finding he was not entitled to shares of Company stock because he did not pay for them.

A

*Interpretation of the Contract*. At trial, Kramer presented copies of the Agreement and Addendum and his testimony in support of his claim he was entitled to, and had paid

8

consideration for, shares of Company stock representing a 20 percent ownership interest, and that Defendants had breached his employment contract by not delivering those shares to him after the termination of his employment. Although the trial court's statement of decision did not expressly interpret the provisions of the Agreement and Addendum regarding Kramer's contractual right to shares of Company stock, it is implicit in its conclusions that the court interpreted those writings as entitling Kramer to shares of stock only if he directly paid money to Company (e.g., by cash or check). Based on that implicit interpretation of the Agreement and Addendum, the trial court then made the factual finding that Kramer had not directly paid any money to Company and therefore was not entitled to any shares of Company stock.

In reviewing the trial court's determination of Kramer's claim for shares of Company stock, we first review its implicit interpretation of the Agreement and Addendum. To the extent the court did not consider any extrinsic evidence in interpreting those writings, we apply a de novo standard and independently decide that question of law. (*Parsons*, *supra*, 62 Cal.2d at pp. 865-866.) Alternatively, to the extent the trial court did consider Kramer's testimony (or other evidence he presented) as extrinsic evidence in support of his suggested interpretation of ambiguities in the contract, we likewise apply a de novo standard and independently interpret that contract and draw our own inferences because Defendants did not present any conflicting evidence. (*Ibid.*; *Johnson*, *supra*, 47 Cal.4th at p. 604; *Burch*, *supra*, 7 Cal.4th at p. 254; *Schaefer's Ambulance Service*, *supra*, 68 Cal.App.4th at p. 586.)

9

Independently interpreting the Agreement and Addendum, we conclude those writings provided that Kramer would be contractually entitled to shares of Company's stock representing 20 percent ownership or equity in Company, to be vested over a four-year period, on his contribution "back" to Company of $8,500 per month during the first year of his employment (i.e., Aug. 1, 2005, through Aug. 1, 2006). Although the Agreement and Addendum provided Kramer would be paid an annual salary of $150,000 during his first year, the Agreement qualified Company's obligation to pay that salary, stating: "This salary will be paid starting when [Company] is financially able to compensate at this level." Assuming the Addendum is ambiguous regarding its provision that Kramer is to contribute back to Company $8,500 per month for the first year for his 20 percent ownership interest, we may consider Kramer's uncontradicted extrinsic evidence in interpreting that ambiguity. (*Southern Cal. Edison Co. v. Superior Court*, *supra*, 37 Cal.App.4th at pp. 847-848; *Badie v. Bank of America*, *supra*, 67 Cal.App.4th at p. 798; *Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165.) Kramer's uncontradicted testimony was that he received only about $30,000 in salary during his first year of employment. By the time the Addendum was signed by the parties in 2006, Company presumably had already been paying Kramer monthly payments less, and clearly *much* less, than that required to pay his full $150,000 annual salary and had been doing so for at least five or six months.

Therefore, at the time the Addendum was signed, both parties knew Company had not been paying Kramer the full amount of his salary during his first year. The objective manifestations of the parties' intent include the words used in the Agreement and

10

Addendum, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into those writings and the subsequent conduct of the parties. (*Morey v. Vannucci*, *supra*, 64 Cal.App.4th at p. 912.) We consider the undisputed fact that Company paid Kramer only about $30,000, instead of his full annual salary of $150,000, during his first year and, further, that both parties knew at the time the Agreement and Addendum were signed that Company had been paying Kramer that greatly reduced salary. Given that factual context, the most reasonable interpretation of the Agreement and Addendum is that the parties intended Kramer's greatly reduced salary during his first year (i.e., about $120,000 less than his full $150,000 annual salary) could constitute his contribution "back" of $8,500 per month to Company during his first year of employment for his 20 percent ownership interest in Company.[1]

Alternatively stated, because—as we discuss further below—the Agreement provided that Kramer's full $150,000 salary would be paid starting when Company was financially able to do so, Kramer's greatly reduced first year salary of about $30,000 presumably was based on Company's claim it was financially unable at that time to pay the full $150,000 amount. Furthermore, the Addendum provided: "[F]or the time period

---

[1]    In so concluding, we do not rely on Kramer's testimony regarding his subjective understanding of the Agreement and Addendum; his letter to other partners, owners, and officers of Company; or Lasker's testimony regarding his employment agreement and/or Company's purported practice of compensating key employees with Company stock in lieu of cash. Even had we considered that evidence, it would have only provided additional support for our conclusion.

11

of August 1, 2005 to August 1, 2006, . . . [Kramer] *will contribute $8500 per month back* to [Company] *for the 20% ownership position* over the four-year time period." (Italics added.) Because the parties signed the Addendum in 2006 after Company had already been making greatly reduced salary payments to Kramer for many months since August 1, 2005, the parties knew at that time that Company had not been paying Kramer a sufficient amount of monthly salary (e.g., $8,500 or more) that would allow him to "*contribute* $8500 per month *back* to [Company]" for his 20 percent ownership of Company stock. (Italics added.) Accordingly, based on our review of the Agreement and Addendum and other evidence in the record, we conclude the only reasonable interpretation of the Agreement and Addendum is that both parties intended that Company's reduction of Kramer's first year $150,000 annual salary by more than $8,500 per month (i.e., $102,000 or more) could represent Kramer's contribution "back" to Company and therefore could constitute Kramer's payment for his 20 percent ownership position in Company pursuant to the Agreement and Addendum.[2]

---

[2]    Even if the trial court, and we, concluded the Agreement and Addendum were not ambiguous regarding Kramer's contribution back to Company of $8,500 per month during his first year and therefore no extrinsic evidence was admissible on that issue, we nevertheless would conclude, as a matter of law, that the only reasonable interpretation of the express language of those writings is that Kramer's reduced salary during his first year of employment could constitute his contribution back to Company of $8,500 per month during that first year. The trial court's implicit interpretation requiring Kramer to directly, rather than indirectly or constructively, pay Company $8,500 per month during his first year is not the most reasonable interpretation of the Agreement and Addendum, and therefore we adopt our independent interpretation of those writings rather than the trial court's contrary interpretation.

The reasons cited by the trial court in its statement of decision for concluding otherwise are not persuasive. The court gave inordinate weight to the discrepancy between the $120,000 amount of the first year salary reduction (i.e., $150,000 less $30,000) and the $102,000 total amount Kramer was to contribute back to Company (i.e., $8,500 per month during his first year) pursuant to the Addendum for his 20 percent ownership interest. Mathematical imprecision is insufficient to overcome the objective manifestations of the parties regarding their mutual intent as expressed in the Agreement and Addendum, especially considering the fact the Agreement and Addendum were signed by the parties many months after Kramer started work at Company and presumably had been paid a monthly salary much less than his full salary set forth in those writings. Also, in support of its decision, the court cited Kramer's testimony that he did not know whether he had declared the $102,000 "credit" amount as a taxable event on his income tax returns. However, as Kramer asserts, his subsequent treatment of any taxable event is irrelevant in determining the parties' objective manifestations in the Agreement and Addendum in 2005 and 2006 of their mutual intent regarding his contractual right to a 20 percent ownership interest in Company.[3]

---

3    Accordingly, the trial court's belief that Kramer's testimony was "less than credible" regarding his lack of knowledge regarding income tax returns filed many years before trial is likewise irrelevant and, in any event, we independently determine this question of law based on the nonconflicting extrinsic evidence in this case.

13

B

*Undisputed Evidence of Kramer's Contribution*.  After implicitly finding the Agreement and Addendum required Kramer to directly pay Company $8,500 per month during his first year to obtain his 20 percent ownership interest in Company, the trial court then found there was no evidence showing Kramer directly paid Company any amount during his first year.  The court further found the $120,000 amount of the reduction in Kramer's first year salary (i.e., the full $150,000 contract amount less the $30,000 amount Company actually paid him) did not constitute payment for that 20 percent ownership interest under the Agreement and Addendum.  Accordingly, the court made the factual finding that Kramer had not paid Company for the 20 percent ownership interest as required by the parties' contract.

However, based on our independent interpretation of the Agreement and Addendum as discussed above, we conclude there is insufficient evidence to support the trial court's finding that Kramer did not pay for the 20 percent ownership interest pursuant to the parties' contract.  Rather, the evidence is uncontradicted that Company paid Kramer only about $30,000 in salary during his first year of employment, $120,000 less than the full $150,000 salary set forth in the Agreement and Addendum.  We concluded above the only reasonable interpretation of the Agreement and Addendum is that both parties intended Company's reduction of Kramer's first year $150,000 annual salary by more than $8,500 per month (i.e., $102,000 or more) could represent Kramer's contribution "back" to Company and therefore could constitute Kramer's payment for his 20 percent ownership position in Company pursuant to the Agreement and Addendum.

14

Therefore, when Kramer completed his first year of employment with Company and it paid him an annual salary of only about $30,000, more than $102,000 less than the full $150,000 contract amount, Kramer, in effect, "contributed" $8,500 per month "back" to Company and, in so doing, did in fact pay for his 20 percent ownership interest in Company. Contrary to the trial court's view, there was no need for Company to pay Kramer that additional $8,500 per month (or $102,000 total additional amount) during the first year and then have Kramer, in turn, directly pay Company back that amount for him to be entitled to his 20 percent ownership interest. Instead, the same end result occurred when Company paid him more than $102,000 less than his full $150,000 contract salary because Company was able to retain that $102,000 amount in exchange for giving him a 20 percent ownership interest. Alternatively stated, we conclude Kramer indirectly contributed $8,500 per month "back" to Company when it paid him more than $8,500 per month less than his full contract salary. We conclude the uncontradicted evidence shows Kramer did, in fact, pay for a 20 percent ownership interest in Company pursuant to the Agreement and Addendum.

C

*Breach of Contract and Remedy*. Based on our discussion above, Company breached the Agreement and Addendum when it terminated Kramer's employment and did not give him the 20 percent ownership interest in Company for which he had paid under his contract. However, Company asserts Kramer did not prove he is entitled to any remedy for its breach of contract. Company argues that because Kramer did not present any expert testimony or other evidence showing the financial value of Company or his 20

15

percent ownership interest, he did not carry his burden of proof to show he is entitled to compensatory damages for that breach. Company also argues Kramer is not entitled to either specific performance or declaratory relief for its breach of contract because he, in effect, waived those remedies in his pleadings and deposition testimony.

We agree with Company's assertion, and Kramer does not argue otherwise, that Kramer did not present any expert testimony or other evidence showing the financial value of Company or his 20 percent ownership interest in Company. Absent such evidence, we conclude Kramer did not carry his burden as a plaintiff to show he is entitled to compensatory damages for Company's failure to give him his 20 percent ownership interest in Company. The trial court correctly found Kramer was not entitled to compensatory damages for Company's failure to deliver to him shares of its stock representing a 20 percent ownership or equity interest.

However, we disagree with Company's argument that Kramer waived any claim for specific performance or declaratory relief for its breach of contract by not delivering to him the shares of Company stock for which he had paid. As noted above, Kramer's complaint requested relief including declarations that he is a vested 20 percent owner of Company stock and Company must issue stock certificates to him representing that ownership, and an order compelling Company to issue stock certificates to him representing that ownership. Therefore, Kramer requested both specific performance and declaratory relief.

Contrary to Company's argument, we conclude Kramer did not waive any of that requested relief during his deposition. In a motion in limine, Company sought to

16

preclude Kramer from seeking specific performance on the ground he stated in his deposition that he sought damages and not the actual stock of Company. In support of its motion, Company submitted excerpts from the transcript of Kramer's deposition testimony in which he gave the following answers to its counsel's questions:

> "Q[:] Are you claiming other compensation than your salary for the time after you were terminated? [¶] . . . [¶]
>
> "A[:] *I think I am apart from salary asking for my ownership position.* [¶] . . . [¶]
>
> "Q[:] You want your ownership position or the financial value of it?
>
> "A[:] *I'm seeking the financial value of it.*
>
> "Q[:] Let's be clear about this because then I may not have to ask a whole bunch of questions. You want the money that your interest, whatever that is, is worth, correct?
>
> "A[:] Correct.
>
> "Q[:] *You don't necessarily want to be part of the company anymore; is that correct?*
>
> "A[:] *Correct.*" (Italics added.)

The trial court denied Company's motion, implicitly finding it had not shown Kramer had waived his request for either specific performance or declaratory relief for the alleged breach of contract by Company for failure to deliver stock representing a 20 percent ownership interest in Company. After trial, the court did not change its ruling on the waiver issue. Instead, its statement of decision simply acknowledged Company's contention that Kramer had waived his right to the shares of Company stock by virtue of his deposition testimony. In so doing, the court did not agree with Company's contention

17

or otherwise rule that Kramer had, in fact, waived his requests for specific performance and declaratory relief arising out of Company's alleged breach of contract.

We conclude Company has not carried its burden on appeal to show the trial court erred by denying its motion in limine and, in so doing, implicitly finding Kramer had not, in fact, waived his requests for specific performance and declaratory relief. Regardless of the applicable standard of review, our review of Kramer's complaint and his deposition testimony shows he did *not* make an election to seek only compensatory damages for Company's breach of its obligation to deliver to him shares of its stock representing a 20 percent ownership interest in Company. Rather, we conclude Kramer preserved his requests for all types of relief listed in his complaint (i.e., compensatory damages, specific performance, and declaratory relief) despite what he stated at his deposition. We conclude, presumably as did the trial court, Kramer's deposition testimony simply stated his preference for compensatory damages (i.e., money) for Company's breach of contract. Kramer initially stated he sought his "ownership position" in Company. By thereafter stating he was seeking the financial value of that ownership position and did not want to be part of Company anymore, he was simply setting forth his preference that he be awarded compensatory damages for the value of the Company stock that had been wrongfully withheld from him by Company. He did not state that if he could not show the financial value of that stock and therefore could not obtain such compensatory damages, he did not want to receive the actual shares of Company stock representing the 20 percent ownership interest allegedly wrongfully withheld from him by Company. Furthermore, after his deposition, Kramer did not amend his complaint to omit his

18

requests for specific performance and declaratory relief. Based on this record, we cannot conclude Kramer waived his requests for specific performance and declaratory relief. We conclude the trial court correctly denied Company's motion in limine. *Universal Underwriters Ins. Co. v. Superior Court* (1967) 250 Cal.App.2d 722, cited by Company, is factually and procedurally inapposite to this case and does not otherwise persuade us to reach a contrary conclusion.

## D

*Statute of Limitations*. Defendants have not presented any substantive legal argument that the four-year statute of limitations for written contracts (Code Civ. Proc., § 337)[4] nevertheless precludes Kramer's breach of contract claim based on their failure to deliver to him shares of Company's stock representing a 20 percent ownership interest.[5] Defendants raised the affirmative defense of the four-year statute of limitations in their answer to the complaint. In its statement of decision, the trial court made an alternative finding that the statute of limitations barred, at least in part, Kramer's claim for shares of Company's stock, stating: "The statute of limitations would again bar any claim for stock issuance on August 1st of 2006 and 2007, for the same reasons applied above to the claim

---

4    All statutory references are to the Code of Civil Procedure unless otherwise specified.

5    Instead, Defendants present a substantive legal argument regarding a statute of limitations defense only as to Kramer's claim for unpaid salary. Regarding Kramer's claim for shares of Company stock, Defendants only summarily state in a footnote that the trial court's statement of decision "correctly notes that because two of these vesting dates occurred more than four (4) years prior to the filing of the action, they are barred by the Statute of Limitations."

19

for unpaid salary."[6] However, we conclude there is insufficient evidence to support the court's finding that the applicable statute of limitations barred Kramer's claim for shares of Company's stock. Section 337 provides a four-year statute of limitations for actions for breach of a written contract. As discussed above, the Agreement and Addendum provide that on Kramer's contribution of $8,500 per month during his first year, he was entitled to a 20 percent ownership interest in Company. Per Schedule A attached to the Agreement, that 20 percent ownership interest would vest over a four-year period (i.e., 5 percent on Aug. 1, 2006, 5 percent on Aug. 1, 2007, 5 percent on Aug. 1, 2008, and 5 percent on Aug. 1, 2009). However, neither the Agreement nor the Addendum contained any provision requiring Company to issue, and deliver to Kramer, stock certificates when each 5 percent amount became vested. At trial, Kramer testified that he never received, and never asked for, any stock certificates from Company. He explained:

---

[6] Regarding Kramer's claim for unpaid salary, the court's statement of decision stated: "[Kramer] is faced with at least a partial bar of the statute of limitations pursuant to . . . section 337. That law provides an action based upon a writing must be brought within four (4) years. Here, the complaint was filed September 16, 2011, so [Kramer] is barred from recovering unpaid salary prior to September 17, 2007. Additionally, there was no credible evidence of when the unpaid salary accrued, e.g., before or after September 17, 2007. It is thus impossible for the court to calculate with any degree of specificity what amount is due." However, except for the court's discussion of the four-year statute of limitations to a claim for breach of written contract, its discussion regarding the application of that statute to Kramer's claim for unpaid salary does not apply to his claim for shares of Company stock. As we discuss below, the crucial question is when Kramer is deemed to have discovered Company's breach. Regarding Company's failure to give Kramer his 20 percent ownership share, we conclude below the evidence does not show he discovered, or could have discovered with reasonable diligence, that breach on or before September 17, 2007.

20

"I assumed that they were part of the company ledger. For example, as mentioned I believe in my deposition, . . . there was a meeting in 2008 in the company between myself, Dr. Dale, and Dr. Raucy where stock certificates came up, who owned what. I was assured in that meeting by Mr. Dale that I was [a] 20 percent owner.

"Maybe also because I have experience with buying stocks and the stock market and never received a stock certificate for that. And I assumed stock certificates or stock ownership was part of the records of the corporation maintained by Mr. Dale."

Kramer further testified that he never examined Company's corporate records and had no reason to do so until after he filed the instant action.

Based on that uncontradicted evidence, there is no evidence showing Kramer discovered, or could have discovered through reasonable diligence, Company's breach of its obligation to give him his 20 percent ownership interest in Company. (Cf. *Angeles Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4th 112, 119.) On the contrary, the undisputed evidence shows Kramer reasonably believed Company maintained proper corporate records showing his correct current ownership interest in Company (i.e., 5 percent on Aug. 1, 2006, 10 percent on Aug. 1, 2007, 15 percent on Aug. 1, 2008, and 20 percent on Aug. 1, 2009). Defendants do not show the fact Company did not issue stock certificates to him on each of those four vesting dates necessarily caused the four-year statute of limitations to begin to run (i.e., that, based thereon, he did, or could have discovered with reasonable diligence, Company's breach of its obligation to give him his 20 percent ownership interest in Company). (*Ibid.*) Rather, on this record it appears the four-year statute of limitations did not begin to run until Company terminated Kramer and thereafter refused to give him his 20 percent ownership interest in Company. We

21

conclude the trial court erred by finding that statute of limitations barred his claim for shares of Company stock.

E

Because we reverse the trial court's ruling denying Kramer's requested relief for specific performance and declaratory relief, we remand this matter with directions for the court to grant the declaratory relief he requested and to conduct further proceedings on his request for specific performance. In so doing, the court should allow the parties to submit briefing on the question of whether all of the requirements for specific performance have been met, including whether Kramer's remedy at law is inadequate. (See, e.g., Civ. Code, § 3384; *Capaldi v. Levy* (1969) 1 Cal.App.3d 274, 281 ["The propriety of specific enforcement of contracts to sell or convey unique items of personal property such as shares of stock in closely held corporations which are not traded in the market and which have no established market value has long been recognized."]; *Kaneko v. Okuda* (1961) 195 Cal.App.2d 217, 233-235; *Korabeck v. Weaver Aircraft Corp.* (1944) 65 Cal.App.2d 32, 39; *Wait v. Kern River Mining etc. Co.* (1909) 157 Cal. 16, 24.) If after further proceedings the court determines those requirements have been met, it shall grant Kramer's request for specific performance.

III

*Kramer's Claim for Earned, But Unpaid, Salary*

Kramer contends the trial court erred by finding he did not prove his claim for earned, but unpaid, salary. He asserts the court erred by misconstruing the Agreement's

22

provision regarding Company's obligation to pay the full amount of his salary set forth therein.

A

As quoted above, section 2.1 of the Agreement provided in part: "Kyle Kramer will receive a salary paid monthly or bi weekly amounting to $150,000 per year. This salary *will be paid starting when* [Company] is *financially able* to compensate at this level."[7] (Italics added.) At trial, Kramer argued that provision should be interpreted as meaning his full salary would be earned each year, but its full payment could be deferred as long as Company was financially unable to pay it. In contrast, Defendants argued that provision should be interpreted as meaning Kramer's full salary under the Agreement and Addendum would not accrue at its full contract amount until Company was financially able to pay it. The trial court's statement of decision concluded that the Agreement "contained the ambiguity that the [C]ompany would not have to start to pay [Kramer's] full salary until it was 'financially able' to do so. . . . However, [Kramer] did not present any expert testimony regarding the [C]ompany's finances and was unable to procure the [Company] CEO's attendance at trial." The court noted the parties' stipulation that Kramer received $497,265 from July 2005 to April 2011 for salary, commission, and purchase of a car. After concluding the statute of limitations was at least a partial bar to

---

7    The Addendum thereafter adjusted the amounts of Kramer's annual salary for subsequent years as follows: $175,000 for August 1, 2006, through August 1, 2007; $200,000 for August 1, 2007, through August 1, 2008; and $225,000 for August 1, 2008, through August 1, 2009.

Kramer's unpaid salary claim, the court stated: "[E]ven if the statute was not a bar, it would still be impossible to determine what amount is owed as salary due to the ambiguity of what amount was paid as salary."

B

Based on our independent review of the Agreement, we believe the Agreement's provision that Kramer's full contract salary "will be paid starting when [Company] is financially able to compensate at this level" is susceptible to two reasonable interpretations (i.e., Kramer's interpretation and Defendants' interpretation). Accordingly, extrinsic evidence was admissible to aid in the interpretation of that phrase. However, as we concluded above, Kramer's extrinsic evidence was undisputed and therefore we review the question de novo and independently interpret that contractual phrase in consideration of that uncontradicted evidence. (*Parsons*, *supra*, 62 Cal.2d at pp. 865-866; *Johnson*, *supra*, 47 Cal.4th at p. 604; *Burch*, *supra*, 7 Cal.4th at p. 254; *Schaefer's Ambulance Service*, *supra*, 68 Cal.App.4th at p. 586.) Kramer testified at trial that he was never paid the full amount of his salary per the Agreement and Addendum, stating Dale told him each year that Company either was "paying what [it] could afford" or "didn't have the money" to pay him the full amount. However, Kramer does *not* cite, and we are unaware of, any testimony by him that when he entered into the Agreement and Addendum he understood section 2.1 of the Agreement to mean that his full contract salary would be earned each year, but its full payment could be deferred as long as

24

Company was financially unable to pay it.[8] Therefore, we conclude the uncontradicted extrinsic evidence does not aid us in interpreting the ambiguities in section 2.1 of the Agreement.

Considering the ambiguities in section 2.1 of the Agreement, we conclude the most reasonable interpretation of that provision is that Company was not required to pay the full amount of his contracted salary whenever it was financially unable to do so. In so concluding, we focus in particular on the words "starting when" Company is financially able, reasoning that accrual of Kramer's full salary would not "start" until Company is financially able. That phrase in section 2.1 constituted, in effect, a condition precedent to Company's obligation to pay his full contract salary. Therefore, his full contract salary would begin to accrue and was required to be paid only when Company was financially able to pay it. Alternatively stated, contrary to Kramer's assertion, that provision did *not* provide that his full salary would accrue as earned salary during the entire term of the Agreement and its payment could be deferred until such time as the Company was financially able to pay it. Furthermore, contrary to Kramer's assertion, the Addendum did *not* modify section 2.1 of the Agreement by, in effect, deleting the phrase that his contracted salary "will be paid starting when [Company] is financially able to compensate at this level." Rather, as Kramer testified at trial, the Addendum set forth "salary increases" for subsequent years of the Agreement's term (i.e., more than the initial

---

8    Likewise, we are unaware of any testimony showing Kramer informed Defendants of that purported understanding or that they, in fact, shared that understanding.

$150,000 annual salary set forth in the Agreement). Therefore, the Addendum did not, expressly or implicitly, amend or modify any other original provisions of the Agreement regarding salary, such as section 2.1 of the Agreement.

C

Given our interpretation of section 2.1 of the Agreement, we conclude the trial court properly denied Kramer's claim for unpaid salary, albeit on grounds other than that cited by the court in its statement of decision. Because the Company's obligation to pay the full contracted salary amount did not start (i.e., did not begin to accrue) until it was financially able to do so, it was Kramer's burden at trial to show Company was, in fact, financially able to pay the full contracted amount of his salary at some particular time during the term of the Agreement. Otherwise, Company's contractual duty to pay that full amount would never have arisen and there could be no breach of the Agreement and Addendum based on its failure to pay that full contracted salary amount. However, as Defendants assert, there is *no evidence* in the record showing Company was ever financially able to pay the full contracted amount of Kramer's salary during the term of the Agreement. Kramer did not present any testimony of an expert (or percipient) witness that Company was "financially able" to pay the full amount of his salary. To the extent Kramer may have testified that Company bought Dale and/or Raucy expensive cars or paid for their vacations, that evidence did not support a reasonable inference, nor do we infer from it, that Company was financially able to pay Kramer's full salary. Because Kramer did not prove an essential element of his unpaid salary claim (i.e., that Company breached that obligation because it was financially able to pay his full salary

26

during the term of the Agreement), the court properly denied that part of his breach of contract cause of action.[9]

### D

Because we uphold the trial court's decision on Kramer's unpaid salary claim, we need not, and do not, address any other alternative grounds that could also support its decision. We do not address the court's application of the four-year statute of limitations to that claim or its finding that the amount of his unpaid salary was too uncertain and therefore could not be calculated with sufficient certainty. Likewise, we do not address Defendants' argument that Kramer waived any claim to earned, but unpaid, salary by accepting reduced salary amounts each year without objecting to them.

### IV

*Nonattendance of Witnesses*

Kramer contends the trial court erred by not compelling Dale and Raucy to attend the trial. He argues the court abused its discretion under section 1987 by not shortening the time for the notices to appear that he served on Dale and Raucy, or by not continuing the trial so that he could serve new notices on them. Kramer argues because of that

---

[9]     In so concluding, we reject Kramer's argument that the issue of Company's financial ability was moot because it repudiated the contract before the time for its performance became due. He does not persuade us the doctrine of anticipatory repudiation should apply in this manner based on Company's refusal to pay the full amount despite his failure to show that obligation ever accrued during the term of the Agreement (i.e., that Company had the financial ability to pay the full contracted salary during that term).

purported abuse of discretion, Dale and Raucy were not required to attend the trial and were not available as witnesses (e.g., to testify regarding Company's finances).

Section 1987, subdivision (b), provides in pertinent part that a written notice for a party to attend the trial must be served on that party at least 10 days before the time required for attendance "unless the court prescribes a shorter time." In this case, Kramer served notices to appear on Dale and Raucy only seven days before he sought their appearances as witnesses, and the court denied his request that it retroactively shorten the 10-day period for such notices pursuant to its discretion under section 1987, subdivision (b). Accordingly, Dale and Raucy did not appear at trial and were unavailable to testify as witnesses.

Assuming arguendo Kramer is correct that the trial court abused its discretion by either not retroactively shortening the section 1987 10-day period for service of notices to appear on Dale and Raucy or not continuing the trial so that he could issue new notices or to allow the full 10-day period to run, we conclude, as Defendants assert, he has not carried his burden on appeal to show the trial court's error was prejudicial. On appeal, "we cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) Accordingly, when an appellant asserts error but fails to make any argument showing why that error is prejudicial, we must reject that contention. (*Ibid.*; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Kramer's appellant's opening brief does not contain *any* legal argument showing how that purported error by the trial court was prejudicial. At most, it suggests Dale and Raucy

28

could have testified regarding Company's finances had they been compelled to attend the trial. However, that assertion is insufficient to carry his burden on appeal to show a miscarriage of justice (i.e., it is reasonably probable he would have obtained a more favorable result at trial had those parties been required to attend the trial). (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Because Kramer, at most, speculates those witnesses could have provided evidence favorable to his case, we conclude he has not carried his burden on appeal to show prejudicial error based on the trial court's purported abuse of discretion.

## DISPOSITION

The judgment is reversed to the extent it denied Kramer's breach of contract claim for shares of Company's stock and the matter is remanded with directions that the trial court grant his request for declaratory relief and conduct further proceedings on his request for specific performance consistent with this opinion. In all other respects, the judgment is affirmed. Kramer is awarded his costs on appeal.

McDONALD, J.

WE CONCUR:

NARES, Acting P. J.

HALLER, J.

29